Jones v. Roberts.

HESTER JONES *et al.*, Respondents, v. MINA ROBERTS *et al.*, Appellants.

St. Louis Court of Appeals, May 28, 1889.

1. **Will: BURDEN OF PROOF.** In an action in which the validity of a will is contested, the burden of proof as to the sanity of the testator is upon the party upholding the will.

2. ———: ———. When in such an action undue influence in procuring the execution of the will is charged, the burden of proof on this issue is upon the contestant; but if a confidential relation between the testator and legatee is established a presumption of the exertion of undue influence by the latter arises, and the burden of proof shifts to him.

3. **Practice, Trial: INSTRUCTIONS.** An instruction that the defendant is required to establish a matter, as to which the burden of proof rests upon him, by competent evidence, is misleading and erroneous; it is the province of the court to declare what evidence is competent.

4. **Practice, Trial:** EXAMINATION OF WITNESSES. A witness may be cross-examined upon any issue on trial, without becoming the witness of the cross-examiner as to matters in regard to which he was not examined on his direct examination.

5. **Practice, Trial:** INSTRUCTIONS. A demurrer to the evidence on any one of several issues on trial is not proper practice; a direct instruction, declaring that the evidence is insufficient, should be asked.

6. ——: ——. An instruction, that "by undue influence is meant the substitution of the intention of another for that of the testator," is too general and therefore erroneous.

7. **Wills:** EVIDENCE. Declarations of the testator before and after the making of a will are competent evidence on the question of his testamentary capacity, but not on an issue as to undue influence in procuring the execution of the will.

8. ——: UNDUE INFLUENCE. The exertion of influence by means of an appeal to gratitude for past services, or to pity because of the needy circumstances or condition of a party, or by means of reasonable and proper argument, is legitimate.

*Appeal from the Pike County Circuit Court.*—Hon. E. M. HUGHES, Judge.

REVERSED AND REMANDED.

*W. H. Morrow* and *D. A. Ball*, for the appellants.

(1) The burden of proof which the law imposes upon the proponents of a will in order to establish a *prima facie* case extends no further than to the making of the will, its attestation according to statutory requirements, and proof of the sanity of the testator by the attesting witnesses. *Harris v. Hays*, 53 Mo. 96; *Rankin v. Rankin*, 61 Mo. 295; 1 Jarmin, Wills, pp. 104, 5 and 7; Bailey's Onus Probandi, 151 and 389; *Jackson v. Hardin*, 83 Mo. 182. As to undue influence, the burden of showing that a will was procured by undue influence is upon the party alleging it. 1 Jarmin on Wills [5 Am. Ed.] p. 142, and authorities there cited. (2) George Hind as an attesting witness to the will, introduced by proponents for the purpose

of proving its execution and the sanity of testatrix, could not be examined by contestants on the issue of undue influence without making him their witness and conducting the examination accordingly. (3) The court should have sustained the demurrer to the evidence in reference to the exercise of undue influence on the testatrix by Sophia Fritz, and likewise the demurrer to the evidence to establish undue influence on the part of Mina and Frederick Roberts. (4) Instruction number 1, given for plaintiffs, is erroneous because it imposes the burden of proof as to all the issues involved, affirmative and negative, upon the defendants, and because it not only submits to the jury to determine whether the will is valid or not, without defining what constitutes a valid will, but because it leaves to the jury to say what evidence given in the case was competent. *Morgan v. Durfree*, 69 Mo. 480; *Estes v. Fry*, 22 Mo. App. 88; *Speak v. Ely*, 22 Mo. App. 123. (5) Instruction number 7, which defines "undue influence," is indefinite and misleading. The substitution of the intention of another for one's own intention may be entirely legitimate; in order to be unlawful it must be fraudulently or coercively substituted. 1 Jarmin on Wills, pp. 132 to 135; *Young v. Bidenbaugh*, 67 Mo. 574; *Sunderland v. Hood*, 13 Mo. App. 232. (6) The defendants' instruction number 1, which was refused, correctly announces the law as to the declarations of the testatrix. *Bush v. Bush*, 87 Mo. 480; *Rule v. Maupin*, 84 Mo. 587; *Spoonmore v. Cables*, 66 Mo. 579; *Gibson v. Gibson*, 24 Mo. 227; *Tingley v. Cowgill*, 48 Mo. 291; *Hesster v. Hesster*, 16 Atl. Rep. [Pa.] 342; 1 Jarmin on Wills, p. 135; *Pemberton v. Pemberton*, 7 Atl. Rep. 642. (7) Defendants' instruction number 2 should have been given, as succinctly and properly defining the meaning of undue influence. 1 Jarmin on Wills [5 Am. Ed.] pp. 132 to 135; *Jackson v. Hardin*, 83 Mo. 175; *Sunderland v. Hood*, 84 Mo. 293; *Ketchum v. Stearns*, 8 Mo. App. 70. (8) And defendants' instruction

number 6 correctly declares the law in reference to such influences as are not legally reprehensible, and was properly adjusted to the facts of this case. 1 Jarmin on Wills [5 Am. Ed.] p. 132; *Brinkman v. Bruggesick*, 71 Mo. 553; *Hall v. Hall*, 1 Prob. & Div. Law Rep. 481; *McCulloch v. Campbell*, 5 S. W. Rep. 590.

*Reynolds & Lewis*, for the respondents.

The court did not commit error in holding the *onus* to be upon the defendant to establish the instrument as the will of the testatrix—that is, that it was duly executed according to law, and that the testatrix was of sound mind and disposing memory when it was executed. *Tingley v. Cowgill*, 48 Mo. 291. (2) The court did not commit error in permitting respondent to cross-examine George Hind, or any other witness introduced by appellant on the issues involved in the whole case. *Railroad v. Silver*, 56 Mo. 265. (3) It was for the jury, under all the attendant facts and circumstances, to say what influence, if any, Mrs. Fritz exerted, and a demurrer to the evidence was properly overruled. The same is true in regard to the influence exerted by Mr. and Mrs. Roberts. It was for the jury to say, under all the facts and circumstances, and that there was such evidence is disclosed by the testimony of Mrs. Gardner and that of Mrs. Roberts herself. The appellant is evidently mistaken as to the scope of instruction number 1 (R., p. 179), when he says "it imposes the burden of proof of all the issues involved, affirmative and negative, upon defendants." It is quite plain that the instructions given in behalf of the respondents presented every issue in the case, and, taken as a whole, are all the instructions necessary in the case, and cover the issues raised by the pleadings and evidence on both sides, and the court would have been fully justified in refusing to give any others.

THOMPSON, J., delivered the opinion of the court.

This was a petition under section 3980, Revised Statutes, to contest the validity of a will which had been admitted to probate by the probate court of Pike county. The will was that of Charlotte Bennett, who died on the twenty-fifth of December, 1884, about sixty-five years of age, leaving no bodily issue. The will was executed on December 1, 1884, and was admitted to probate on January 1, 1885. The contestants are the nephews and nieces of the alleged testatrix, children of certain of her brothers, who died prior to her decease. The defendants are legatees under the will,—the principal defendants being Mina Roberts and Frederick Roberts, her husband, who are jointly made the residuary legatees in the will. The petition challenges the validity of the will on three grounds:—

*First.* Because, at the time of the execution of said instrument and for a long time previous thereto, the said Charlotte Bennett was old and infirm, and her mind had been so greatly weakened and impaired by old age, domestic trouble and disease, that she was incapable of making an intelligent disposition of her property, and had not sufficient mind to comprehend and understand the nature and consequences of said will or the disposition of her property attempted to be made therein.

*Second.* Because the said Charlotte Bennett was induced to execute said pretended will on account of threats, coercion and undue influence on the part of the defendants, Mina Roberts and Frederick Roberts, her husband.

*Third.* Because the said Charlotte was induced to execute said pretended will on account of an undue influence exercised over her by the defendant Sophia Fritz.

The answer consisted of a special traverse of each of these grounds. There was a trial before a jury, and a

verdict and judgment in favor of the plaintiffs, setting aside the will.

The evidence adduced at the trial tended to show that the maiden name of Charlotte Bennett was Hicks; that her family resided in West Virginia; that when she was about sixteen years of age she married one Jacob Linder, and that in 1839, she came with him to Louisiana, Missouri, where she resided until the time of her death. Her husband, Jacob Linder, died about 1870, and she continued to carry on a small notion store, which they were conducting at the time of his death, and continued to reside in the back and upper room of the store building until her death. Four or five years prior to her death she married one Dr. Bennett, but was shortly after divorced from him upon his petition. Dr. Bennett had let her have five hundred dollars to make a part payment of a debt due by her to Sophia Fritz, which was secured by a mortgage on her real estate. After the divorce, Dr. Bennett brought an action against Mrs. Bennett to recover this sum and interest, and this action was pending at the time of her death. After her divorce from Dr. Bennett she continued to live entirely alone, carrying on the little store and residing in the back room and also in the upper room of the house in which the store was carried on. While so residing she became subject to the hallucination that Dr. Bennett was trying to poison her, and in order to prevent him from poisoning her well, she had a house built over it. Her family relatives continued to live in West Virginia, except such as had removed to other parts of the country. A total cessation of intercourse had taken place between them; for thirty years no communication had passed between them; and they did not learn of her death until a year after it had occurred. Indeed, she never spoke of her relatives to her most intimate friends, and they did not know that she had relatives living. She had made a will, bequeathing all of her property to the Christian church of Louisiana, Missouri,

in consideration of the church caring for her during such portion of her life as she might be unable to care for herself. This will was in existence in August, 1884, when she was stricken with partial paralysis. She recovered from this stroke sufficiently to get about the store with the aid of a cane, and to look after her business as she had done before. She was, however, unable to take care of herself and to attend to her housekeeping, and she received attention and help from the ladies of the church; but, whether justly or unjustly, she conceived that the church was neglecting her, and of her own motion destroyed the will which she had made to them. She then employed help, not keeping any one very long. Finally she seems to have tired of depending upon hired help, and made an arrangement with the defendant Mrs. Roberts to come and stay with her. She and Mrs. Roberts had known each other for many years, and were intimate friends. Mrs. Roberts stayed with her at first for a couple of weeks, until the services of a hired attendant were secured. This attendant left some time in November, the month before that in which Mrs. Bennett died, and Mrs. Roberts again came to wait upon her and take care of her. The latter part of November, Mrs. Bennett was again stricken with paralysis, and was not thereafter able to leave her bed until her death. She was a very large woman, and Mrs. Roberts, being unable to handle her alone, called in the aid of her husband, and they attended to her faithfully, kindly and attentively, as the evidence tends to show, until she died. This latter stroke of paralysis was so severe as to paralyze the entire right side of Mrs. Bennett, and so impaired her speech that only those who were accustomed to be with her could understand her. Indeed, she seems to have communicated for the most part by making signs.

In this condition Mrs. Bennett sent for the lawyer, who was her counsel in her litigation with Dr. Bennett, for the purpose of having him make her will. A

description of the scene at the bedside, when the will was drawn and signed, was of a nature strongly to impress one with the belief that Mrs. Bennett had passed the period at which she was capable of making a will.   Aside from the hallucination which she had conceived, that Dr. Bennett, her late husband, was trying to poison her, there was some evidence—we will not observe upon its credibility—to the effect that she had formed the same conception in regard to members of the church.   One old friend, formerly her family physician, had called to visit her with his wife; and she, on his coming in, broke out into a sudden fit of laughter, threw up one of her hands and said : "Help me up; I want to stand up long enough to get married to brother Keith."   This was previous to the second stroke of paralysis.   The medical testimony tends to show that the seat of the paralysis was in her brain; and that she was not only peculiar, but also somewhat imbecile, prior to the last stroke.   When the alleged will was made Mrs. Bennett lay in bed, her entire right side paralyzed, and, as the testimony of the subscribing witnesses tends to show, unable to communicate except by signs.   The lawyer who drew the will would write a sentence and read it over to her, desiring to know if it was right, and she would indicate by signs whether it was right or wrong, and, if it was not right, have it erased and corrected.   One of the subscribing witnesses testified as follows :   "Q.   All the instructions she could give was by signs ?   A.   But she could use her left hand.   She could make a sign, but I could not understand it.   Q. Was her tongue paralyzed?   A.   Apparently so.   Q. Where were you sitting ?   A.   At the foot of her bed. Q.   Where you could hear her ?   A.   Yes, sir.   Q. But you could not understand what she meant ?   A.   No, sir.   Q.   How close were you to her ?   A.   Just the length of the bed ; about six feet.   *   *   *   Q.   You could not understand anything she said ?   A.   No, sir; I could understand her motions as well as the others, but

her speech I could not understand. She motioned to Captain Morrow [ the draughtsman of the will ] to stop, and he would read, and she would indicate it was not right, and he spoke again, and she indicated it was right. Mrs. Roberts could understand most that she said. Mrs. Roberts would answer her, and Mrs. Linder [ meaning Mrs. Bennett ] would answer back. Q. In making the will none of you could understand her? A. I could not. Q. When there was any difficulty about it, Mrs. Roberts would talk to her? A. Yes, sir. Q. Mrs. Roberts would indicate to Mr. Morrow? A. No, sir ; it was merely to get something for her that she talked at all. It was to get water or something. When Mr. Morrow read the will he spoke the words, and she nodded that it was correct. Q. How did Captain Morrow find out whom she wanted to give the property to? A. I suppose she had arranged that before. I could not tell by her actions. Q. Captain Morrow wrote it down, read it to her, and she nodded her head, and that was all she could do? A. Yes, sir.'' The witness could not tell how it was that Captain Morrow came to insert in the will that portion which made Mr. and Mrs. Roberts the residuary legatees. He supposed it was done in pursuance of some previous understanding. When Mrs. Bennett asked for water she made a motion with her lips. The other subscribing witness, Mr Lake, seems to have been able to understand the directions given by Mrs. Bennett when the will was drawn.

The signature to the will was not made by the hand of the testatrix, but by Dr. Dreyfus, her attending physician. Dr. Dreyfus could not even testify that she directed him to sign the will, though there was other testimony that she did. He testified as follows : ''Q. Why did you do it? A. She could not write. She had very imperfect use of her right hand, and I was requested to sign for her. Q. Who requested you? A. I could not say positively as to that. I do not

remember. I know it was agreed upon that I should sign the name, and I did so." The testimony of Dr. Dreyfus, of Captain Morrow, and of the subscribing witnesses, tended to show that, notwithstanding the extremely low physical condition of Mrs. Bennett, she retained sufficient strength of memory to make a will.

Upon the question of the *undue influence* of Mrs. Roberts and Mr. Roberts, there was no direct testimony, except that of one witness, Mrs. Gardner. The only circumstantial evidence in support of Mrs. Gardner's testimony which we glean from the record was the fact that Mrs. Roberts, with the assistance of her husband, was nursing Mrs. Bennett in what all of them, including Mrs. Bennett, understood to be her last illness. Although the evidence does not indicate that Mrs. Bennett was neglected by her other neighbors or by the ladies of the church, or would have been neglected if Mrs. Roberts and her husband had not been in attendance upon her,—yet the fact remains that they were her superiors in what the law on this subject regards as a confidential relation, the relation of patient and nurse upon a dying bed.

We find no substantial evidence to support the charge in the petition of any undue influence on the part of Sophia Fritz.

I. The first assignment of error relates to the rulings of the court upon the question of the *burden of proof*. Before any evidence was heard, the defendants stated that their understanding was that the formal attestation of the will was all they had to prove. The court ruled that this was not sufficient, but that the general burden of proof was on the defendant. To this ruling the defendants excepted. Beyond question, so far as the issue of sanity was concerned, the burden of proof was upon the defendants. In the case of *Elliott v. Welby*, 13 Mo. App. 19, 28, which was a case of this kind, this court said : "In the present case, according to the established rule in this state, the burden of proof

throughout rested upon the defendants, who were
endeavoring to establish the will. The plaintiffs did
not admit that the alleged testator was of sound and
disposing mind, but expressly denied this in their peti-
tion. It was a point in issue, to be established by the
defendants who propounded the will, and the burden
was not shifted by the introduction of the sworn attesta-
tion to the will before the clerk of the probate court at
the time it was proved there. * * * If the general pre-
sumption of sanity is to be said to exist at all in respect
to wills, such a presumption, that men are sane, may
stand instead of proof, and to make out a *prima facie*
case ; but it does not change the burden of proof. The
party whose case requires proof of the fact has the
burden of proof." In this case, this court followed the
ruling of the supreme court in *Benoist v. Murrin*, 58
Mo. 307, 322, where it was said: "This question was
thoroughly considered in *Delafied v. Parish* (25 N. Y.
9), and, as the result of the authorities, it was held, that
in all cases the party propounding the will is bound to
prove to the satisfaction of the court that the paper in
question does declare the will of the deceased; and that
the supposed testator was, at the time of making and
publishing the document propounded as his will, of
sound and disposing mind and memory; and that this
burden is not shifted during the progress of the trial,
and is not removed by proof of the *factum* of the will
and testamentary competency, by the attesting witness,
but remains with the party setting up the will." The
court, therefore, was correct in the ruling complained
of, so far as the issue of *sanity* was concerned.

II. As to the issue of *undue influence*, the record
presents a different question. When the defendants
had presented their evidence, showing the execution of
the will and supporting their contention that the alleged
testatrix was possessed of testamentary capacity when
she made the will, they rested. The plaintiffs then went
forward with their testimony and presented testimony

tending to rebut the testimony of the defendants to the effect that the alleged testatrix was possessed of testamentary capacity when she made the will ; and they also presented evidence tending to show that the will was made under undue influence exerted upon the alleged testatrix by Mrs. Roberts.    The court refused to instruct the jury, at the request of the defendants, that "undue influence is not to be presumed, but must be proved as any other fact, by satisfactory evidence given in the case."    But the court, on the contrary, instructed the jury that the general burden of proof was on the defendants, in the following language : "The jury is instructed in this case that the burden of proof is on the defendants; that is, defendants are required to establish, by competent evidence, to the satisfaction of the jury, that the paper read in evidence purporting to be the will of Charlotte Bennett is the valid will of Charlotte Bennett." This was tantamount to declaring that the burden of proof in respect of both of the issues was on the defendants.    This we think was error.    It is said in a very learned work on the law of administration, just published : "Influence is never presumed (except in the case to be considered below, between attorney and client, or where the legatee sustained a fiduciary relation to the testator), but must always be proved by the party alleging it."    Woerner Am. Adm., sec. 31.    "The rule that undue influence may never be presumed, but must be proved by the person who alleges it, is subject to an exception in those cases in which a legacy is given by a testator to his attorney, confidential adviser, guardian, or other person sustaining toward him any fiduciary relation."    *Ib.*, sec. 32.    The learned author supports these two propositions by the citation of numerous cases.    It must follow that in every case where a will is contested on the ground of undue influence, and it is not admitted by the pleadings that the legatee occupied toward the alleged testator the superior position in a confidential relation, the *initial burden of proof* rests

upon the contestant, at least so far as to show that the proponent of the will did occupy such a relation to the alleged testator. When this fact is admitted or shown, then a presumption arises against the validity of the will, and the burden is cast upon the proponent of the will of overcoming this presumption. *Street v. Goss*, 62 Mo. 226; *Bradshaw v. Yates*, 67 Mo. 221, 228; *Caspari v. First German Church*, 12 Mo. App. 293, 314, and numerous cases cited.

In this case, it was not alleged in the petition that Mr. and Mrs. Roberts, or Sophia Fritz, occupied any confidential relation towards Mrs. Bennett. The naked charge was that the execution of the will was procured by undue influence exerted upon Mrs. Bennett by these persons. The burden of proving this fact, at least so far as showing a confidential relation and bringing the cases within the rule which would change the burden of proof, rested upon the plaintiffs. The declaration of the court *at the outset*, that the entire burden of proof rested upon the plaintiffs, seems not to have been harmful, because it had no other influence than to control the order of proof, and this, as we have seen, proceeded in the natural way. So, the refusal of the court to instruct the jury that on the issue of undue influence the burden was upon the plaintiff, and the action of the court in giving without qualification the instruction that the burden was upon the defendants, seems equally harmless; because the existence of the confidential relation between the alleged testatrix and Mrs. Roberts and her husband was indisputably established, so that the effect of these rulings was merely an assumption of the existence of an established fact, which in itself had the effect of shifting the burden of proof.

III. The instruction in which the court thus announced to the jury the rule as to the burden of proof was erroneous, in that it submitted a question of law to the jury, to-wit, the competency of the evidence adduced to establish the will, by telling them that

"Defendants are required to establish, by *competent evidence*, to the satisfaction of the jury, that the paper read in evidence, purporting to be the will of Charlotte Bennett, is the valid will of Charlotte Bennett." It was for the court to say what evidence was competent; and the jury were bound to regard all the evidence which had been admitted, and not withdrawn from their consideration by instructions, as competent evidence, to be weighed by them in determining the issues of fact submitted to them. The instruction was liable to mislead the jury, by leading them to believe that they had the power to determine what evidence submitted to them was competent, and hence to be considered by them, and what was not.

IV. We do not, however, go to the length of holding that the instruction was bad because of the word "valid" in its concluding clause in connection with the word "will." We do not think that this could fairly be regarded as submitting to the jury the question whether the will was valid in law. The question submitted to them was whether the paper was or was not the will of Mrs. Bennett, and this, at least in ordinary speech, was tantamount to submitting to them the question of the validity of the will. We think it would be too great a refinement to uphold the objection to the use of the word "valid" in this connection.

V. George Hind, an attesting witness to the will, was introduced by the proponents, for the purpose of proving the execution of the will and the sanity of the alleged testatrix. Error is assigned on the ruling of the court in allowing him to be *cross-examined* on the issue of undue influence without requiring the contestants first to call him as their own witness. We see no error in this ruling. Under our state practice, which in this respect follows the practice of the English courts, in contradistinction to the practice of the federal courts, a witness who is sworn to give some evidence, however

slight and unimportant, may be cross-examined in relation to all matters involved in the case. *St. Louis, etc., R. Co. v. Silver*, 56 Mo. 265.

VI. The next assignment of error relates to instructions given and refused touching the clause of the petition which charges undue influence exerted upon Mrs. Bennett by Sophia Fritz. We have already said that we see no substantial evidence in the record supporting this allegation. In respect of this allegation, the defendants offered, among their instructions, one couched in the following language: "Defendants come and demur to so much of the evidence in this case as has been offered for the purpose of proving an undue influence over the testatrix in the making of her will by and on the part of Sophia Fritz." This instruction was refused. On the other hand, the court gave the following instruction on this point, requested by plaintiffs: "If the jury believe, from the evidence in the case, that the paper was executed by the said Charlotte Bennett, by reason of undue influence exercised over her by the defendant Sophia Fritz, and that said paper would not have been so executed but for such undue influence exercised over her by said defendant Sophia Fritz, then the jury must find that said paper is not a valid will."

We are unable to put the trial court in the wrong for refusing the instruction which demurred to so much of the evidence as related to this issue of undue influence exerted by Sophia Fritz, because it is not the practice in this state to demur to a part of the evidence, nor, in a strict sense, to demur to the evidence at all. Counsel no doubt intended to have the court direct the jury that there was no evidence to support this sub-issue. If so, counsel should have requested an instruction in apt words so directing the jury.

But we cannot say the same of the instruction above quoted, given at the request of the plaintiffs, because there was no substantial evidence tending to support the

hypothesis of fact therein contained, that Sophia Fritz had exerted any undue influence over the alleged testatrix. Indeed, the only benefit which Sophia Fritz took under the will was "two canary birds, and a cage for each of said birds," given to her "as a special legacy." She does not appear to have had any special interest in having Mr. and Mrs. Roberts made residuary legatees ; and, in short, this part of the plaintiffs' case fell to the ground for want of evidence.

VII. A similar demurrer to the evidence tending to show undue influence on the part of Mina Roberts and Frederick Roberts was interposed, couched in language similar to that above quoted. It was properly refused, for the reason above quoted, and for the additional reason that there was substantial evidence, direct and circumstantial, tending to support the charge of undue influence on the part of these legatees. The circumstance that this evidence consisted in the testimony of a single witness, whose statements of the declarations made by Mrs. Roberts to her were not corroborated, goes for nothing. The testimony of one witness to a point in issue, if it is distinct, explicit and relevant, will take the issue to the jury, no matter how many witnesses may testify to the contrary, and no matter what circumstances may exist tending to discredit the one witness.

Aside from this there was abundant evidence tending to show the existence of a *confidential relation* between Mrs. Roberts and Mrs. Bennett, in which the latter was helpless and dependent on the former, during the existence of which relation the will was made, and at a time when Mrs. Bennett, if indeed possessing testamentary capacity, was extremely feeble in mind,—subject to hallucinations that persons were endeavoring to poison her, and given to fits of laughing and crying. This state of facts was sufficient to raise a presumption against the validity of the will, under the rule of *Street v. Gross*, 62 Mo. 226, and other cases already cited. If

an instruction advising the jury that, if they should believe that this confidential relation had been established, the presumption of law was against the validity of the will, and the burden of showing that it had been executed by Mrs. Bennett of her own free mind was thereupon shifted upon the defendant, had been tendered by the plaintiffs, it would have been the duty of the court to give it to the jury.

VIII. The arguments which are directed against the second, third, fourth and fifth instructions given by the court at the request of the plaintiffs, seem to us to be needless hypercriticism. We do not feel disposed to countenance refinements in dealing with instructions which are intended for the information of plain men in the jury box, who no doubt in many cases read them very loosely.

IX. But we cannot pass over the seventh instruction given by the court at the request of plaintiffs, which undertook to define undue influence as follows : " By undue influence is meant the substitution of the intention of another for that of the testator." This instruction is plainly vicious, in that it is couched in such general terms that it could be understood by the jury in different senses. The intention of another might become substituted for that of the testator, by merely changing the will or desire of the testator by reasonable and proper argument and persuasion, and this would not constitute undue influence. It has been said by this court : " To make out such a charge of undue influence, it must be shown that an influence was exercised over the mind of the testator which was really a moral coercion, and which constrained him to do that which he did not wish to do, but which, from fear, desire of peace, or some feeling other than affection, he was unable to resist." *Sunderland v. Hood*, 13 Mo. App. 238; s. c. affirmed, 84 Mo. 293. In another case this court defines undue influence in the following language : "Undue influence is that which compels a testator to do

that which is against his will, through fear, through the desire of peace, or some coercive power, which he is unable to resist, and but for the exercise of which he would not have made the will as it was." *Ketchum v. Stearns*, 8 Mo. App. 70. Again, our supreme court has said : "The influence denounced by law must be such as amounts to over-persuasion, coercion of force, destroying the free agency and will-power of the testator. It must not be merely the influence of affection or attachment, nor the desire of gratifying the wishes of one beloved, respected and trusted by the testator." *Jackson v. Hardin*, 83 Mo. 185. These questions show that the above instruction was not drawn in apt language to convey to the minds of the jury a proper conception of that undue influence which in law will operate to set aside a will.

On the other hand, the following instruction, tendered by the defendants and refused by the court, seems to embody in substance the elements of the foregoing definitions of undue influence, and I therefore think that it ought to have been given : "The court further instructs the jury upon this point, that, in order to invalidate the will here in controversy, any influence that may have been exerted over said Charlotte Bennett, inducing her to make said will, must have been such, and it must be so shown by the evidence, as to overpower her volition to the extent of rendering it subservient to the will of the person so exerting it; or that they exerted their influence in the disposition of her property with such force as to destroy her free agency in reference thereto." But on this point Judge ROMBAUER does not agree with me,—he being of the opinion that this instruction, while not stating the law erroneously, would not, by reason of the generality of its language, have been likely to aid the jury, and that the trial court ought not, therefore, to be put in the wrong for refusing it.

X. Evidence was given of certain *declarations* of Mrs. Bennett with reference to the making of her will, both before and after the making of it. These declarations were professedly put in evidence as bearing upon the question of the testamentary capacity of Mrs. Bennett, and as such they were undoubtedly competent. But the defendants had a right to have their effect limited by an appropriate instruction. Such an instruction was tendered in the following language, and refused : "The court instructs the jury that any and all of the declarations made by the deceased Charlotte Bennett, both before and after the execution of her said will, which were given in evidence in this case, should be wholly disregarded by them, as either tending to prove or disprove the fact, in this case, put in issue, as to whether or not she was induced to make the will in question, by reason of undue influence exerted over her by the defendants or either of them." This precise question was ruled upon by the supreme court in the case of *Bush v. Bush*, 87 Mo. 480, where it was held that, on the trial of an issue whether or not a will was made under undue influence, declarations of the alleged testator, made before and after its execution, are inadmissible as evidence of the facts mentioned in such declarations; but that such declarations are only admissible when the condition of the testator's mind is the point of contention, or it becomes material to show the state of his affections; and they are then received as external manifestations of his mental condition, and not as evidence of the truth of the facts referred to in the declarations. This rule originated in *Gibson v. Gibson*, 24 Mo. 227, where the question, when and under what circumstances the declarations of a testator may be received in evidence, was considered at length, and a rule established which has since been followed in this state. The rule briefly is that such declarations are admissible, not as evidence of the *facts* therein declared, but merely as evidence of the *state of feeling* of the testator at the time, and then only in

cases where that is material. *Cawthorn v. Haynes*, 24 Mo. 236; *Tingley v. Cowgill*, 48 Mo. 291; *Spoonmore v. Cables*, 66 Mo. 579; *Rule v. Maupin*, 84 Mo. 587.

XI. The court refused the following instruction, requested by the defendants :

"And the jury are further instructed that persuasions, such as appeal to gratitude for past services, and pity on account of needy circumstances or condition of life, are legitimate and may fairly be pressed on the one making a will as inducements to the disposition of property by will ; and even if it were shown, by the evidence in the case, that such influence was exercised over the deceased by Mrs. Roberts and Frederick Roberts or Sophia Fritz, whereby she was induced to make such disposition of her property as provided for in her said will, yet if the jury believe from the evidence that such influence was gained over the deceased by kindness and friendly attention to her, and that it was exercised solely as a persuasive inducement to the making of the said will and the disposition of her property, and not in such a way as to destroy her freedom of will to such an extent that she could not exercise it in accordance with her own judgment, and that she was not thereby constrained to make a will and to make such a disposition of her property as was against her actual will,—then such influence so exercised is not in contemplation of law undue influence and is insufficient to invalidate said will."

This instruction seems to involve a correct application of the law to a hypothesis of fact which was supported by substantial evidence. It was well calculated to advise a jury of plain men as to what kind of influence will, and what will not, avoid a will. We see no reason why it should not have been given.

XII. The defendants' instruction, which the court refused, advising the jury as to what constitutes a "sound mind and disposing memory," seems to have been well enough; but the principle was covered by instructions which the court gave.

XIII.   We do not think that the court erred in refusing the following instructions requested by the defendants:

"If the jury believe from the evidence in the case that the instrument of writing purporting to be the last will of Charlotte Bennett, deceased, was signed with her name by Dr. J. W. Dreyfus, by her direction and in her presence as her will, and was attested by Geo. Hind and H. W. Lake, in her presence as witnesses thereto, as her will, and they further believed said Hind and Lake to be credible witnesses to the facts testified to by them as to the soundness of the mind of the said deceased at the time of the execution by her of said will,—then the law presumes that said testatrix was of sound and disposing mind, and the burden of proof then rests upon the plaintiffs to overcome by satisfactory proof the presumption of the law that she was of sound mind at the time of making her will."

We think that this instruction is objectionable as being an argumentative instruction.   Parties ought to make their argument to the jury through the lips of their counsel, and the giving of argumentative instructions from the bench ought not to be countenanced. This instruction is also vicious and well calculated to mislead the jury, in that it is so framed as to disturb the free exercise of their judgment by telling them that if they believe the facts testified to by certain witnesses, the law presumes certain results.   Such instructions are calculated to mislead the jury into believing that they are to determine the facts according to some artificial rule which they but vaguely understand, and not according to their reason and experience applied to the evidence before them.   The true office of presumptions of law is to determine the burden of proof and to prescribe the result at which the triers of the fact must arrive in the absence of evidence, and not as arguments to disturb the natural volition of jurors.

Jones v. Roberts.

XIV. We think that the court was also right in refusing the following instruction tendered by the defendants: "The court also instructs the jury that an insane delusion is not such a delusion as arises from a belief, even in itself unreasonable, predicated upon a state of facts that, in the nature of things, or under the circumstances of the case, could or might occur; but that an insane delusion is one that is based on a belief of something impossible in the nature of things or under the circumstances of the case of which it is predicated; and although Charlotte Bennett may have, without apparent reason, suspicioned (*sic*) her then husband, Dr. Bennett, of designing to poison her, still these suspicions—if suspicions they merely were—do not of themselves establish the fact of such unsoundness of mind as to incapacitate her from making a valid will;—and, under the circumstances of this cause, are unworthy of any credit as tending to prove that fact, if the jury should believe that they were not of such a character as to influence her in the making of her will and the disposition therein made of her property." This instruction is so plainly vicious as being a comment on the evidence and an invasion of the province of the jury, as not to require any discussion. If it had been given and if the trial had resulted in a verdict and judgment for the defendants, that judgment must have been reversed for the giving of it. The excessive zeal of counsel to carry the jury by getting the judge to argue the case for them, in the form of instructions, is a prolific source of reversals and new trials, which are so frequent as to be a reproach to the administration of justice.

For the errors pointed out the judgment will be reversed and the cause remanded. Judge ROMBAUER concurs on all the points except the ninth, as above stated. Judge BIGGS, having been of counsel, takes no part in the decision.