## MADDOX *et al.*, *v.* MADDOX *et al.*, *Appellants*.

### Division One, February 6, 1893.

1. **Will**: VALIDITY OF: EVIDENCE.  Evidence that plaintiffs had, twenty-five years before the making of the will in contest, worked on the testator's farm as farm hands is irrelevant on the issue of his testamentary capacity of an undue influence exercised by two of his sons.

2. ———: TESTAMENTARY CAPACITY.  Competency of a testator to engage in or to understand any complicated business matter or transaction is not a proper test of mental capacity to make a will.

3. ———: ———.  A man may be capable of making a will and yet be incapable of making a contract or managing his estate.  (*Brinkman v. Rueggesick*, 71 Mo. 556.)

4. ———: ———.  A testator possesses testamentary capacity if he understands the business in which he is at the time engaged, has a mind and memory capable of presenting to him his property and the persons who are the natural objects of his bounty, and of understanding the distribution of his property as made by the will.

5. ———: ———.  The evidence in this case *held*, to show no want of such testamentary capacity on the part of the testator as to disqualify him to make the will.

6. ———: STATUTORY CONTEST: BURDEN OF PROOF.  The *onus* is on the proponents of a will in a statutory contest to determine its validity, to prove its proper execution and attestation and also that the testator was of a proper age and sound mind.

7. ———: ———: ———.  When the foregoing facts are shown, a will *prima facie* valid is established and it then devolves on the persons attacking its validity to prove fraud or undue influence if either is charged.

8. ———: ———: ———: CONFIDENTIAL RELATION.  Where a confidential relation is shown to exist between the testator and the recipient of his bounty, an exerted influence will be presumed to have induced the bequest and the *onus* is cast on the beneficiary to repel the same.

9. **Will**: TESTATOR: UNDUE INFLUENCE.  The fact that a testator unjustly discriminates in favor of two of his sons, together with the other facts of his old age and great debility, is not sufficient to create an inference that undue influence was exerted by other sons who received a greater portion of the estate.

10. ———: ———. The fact that the two favored sons frequently visited the testator during the last years of his life will not warrant an inference of undue influence.

11. ———: ———. The mere inequality in the disposition of the testator's property does not cast the burden on the favored devisees of explaining the unequal and unnatural provision in the absence of any evidence to show undue influence.

*Appeal from Marion Circuit Court.*—HON. THOMAS H. BACON, Judge.

REVERSED AND REMANDED.

*W. R. Anderson* and *Harrison & Mahan* for appellants.

(1) The court erred in the admission of evidence. *Rogers v. Troost*, 51 Mo. 476; *State v. Thomas*, 99 Mo. 257; *Myers v. Hauger*, 98 Mo. 439. (2) The court should have given proponents' instruction number one. There is nothing in the evidence which even tends to show that Henry or John Maddox exercised any influence over their father in procuring the will. *Jackson v. Hardin*, 83 Mo. 184; *Higgins v. Carlton*, 28 Md. 118. (3) There was not a scintilla of evidence showing testator's want of capacity to make the will and the court should so have instructed the jury. 1 Redfield on Wills, p. 124; *Brinkman v. Rueggesick*, 71 Mo. 556; *Myers v. Hauger*, 98 Mo. 439; *Jackson v. Hardin*, 83 Mo. 180; *Benoist v. Murrin*, 58 Mo. 322; *Converse v. Converse*, 21 Vt. 168; *Harvey v. Sullens*, 46 Mo. 153; 1 Jarman on Wills, 38, and note one. (4) The court committed manifest error in the fifteen instructions given of its own motion to the jury. The issues were plain and easily understood and the great number of instructions given were calculated to lead the jury from the real issues. Instruction number eleven does not properly define undue influence. *Jackson v. Hardin*, 83 Mo. 184;

*Rankin v. Rankin,* 61 Mo. 295. (5) The verdict of the jury was against the law and the evidence. There was no evidence authorizing the jury to find the verdict which they returned. It was the result of passion, prejudice or mistake, and the court should set the same aside, and direct the trial court on the evidence to enter up a judgment for proponents. *Hipsley v. Railroad,* 88 Mo. 353; *Rhodes v. Farish,* 16 Mo. App. 437.

*W. M. Boulware* for respondents.

(1.) The items of evidence specified as objectionable were competent as tending to show the situation, circumstances and relations of the parties and thereby to place the jury as nearly as possible in the position of testator. *Thompson v. Ish,* 99 Mo. 172. (2) Where the provisions of a will are unreasonably and grossly inconsistent with natural affection and the duties of testator with reference to his property and family, that fact will of itself require the beneficiaries under the will to make some reasonable explanation of the unnatural character of the instrument. In such case the natural inference is the legal inference. That inference is that the will is the product either of an unsound mind or of intervening, controlling influence. Especially is this the case where the testator is old and of impaired powers. *Gay v. Gillilan,* 92 Mo. 264; 1 Redfield on Wills [2 Ed.] sec. 14, 515; sec. 53, 537; *In re Liney's Will,* 13 N. Y., Supp. 551; *Carroll v. House,* Al. Rep. (N. J.) 191; *Harnell v. Harnell,* 1 Duvall, 203; *White v. Bailey,* 10 Mich. 155; *Mowry v. Silber,* 2 Bradf. (N. Y.) 133. (3) The record shows substantial evidence of undue influence and justified the verdict.

MACFARLANE, J.—This is a statutory contest over the validity of the will of James Maddox, deceased.

The will was executed December 7, 1887, and the testator died March 4, 1887, leaving surviving him his wife, four sons—Henly J., John F., Jesse P. (called Prior), and William Maddox—one daughter, Matilda, wife of Benjamin D. Morton, and the children of a deceased daughter, a former wife of said Morton.

The will is contested by two sons, Jesse P. and William D. Maddox, on the ground of the want of testamentary capacity of the testator, and the exercise of undue influence by defendants, Henly J. and John F. Maddox. A jury trial resulted in a verdict and judgment against the validity of the will, and defendants appealed.

By his will the testator charged his children with advancements as follows: Henly, $2,232.50; John, $939.50; Benj. D. Morton, $1,231.4 on account of first wife; Matilda Morton, $651.50; Jesse P., $1092.50. The will then provides that John should be made equal with the advancement made to Henly, and be paid $1,000 additional to make up for the time at which it was paid. It directs that $1,000 each for William and Jesse be held by the executors in trust to pay them the income during life, and at their death $1,000 to be divided between Henly and John "for their trouble and care of Jesse P. and William," and the other $1,000 to be paid the children of Morton. After leaving small legacies to the children of said Morton the residue of the estate is devised to Henly J. and John F. in equal parts. The estate passing under the will was valued at about $11,000, more than half of it being subject to the life estate of the testator's wife to whom it was devised.

The evidence shows that the testator was about eighty years of age at the time of making the will. That he was in feeble health for a year or two before his death. His right hand was "shaky," he had a

large wen on his neck, and suffered from asthma. He was not confined to his house on account of his feeble health when he made his will, but was able to go out, and attended to his own business up to near his death. When the will was written, the writer, Mr. Lafon, who was also one of the witnesses, and F. B. Kellar, the other witness, had before them a book in which an account of the advancements were entered. It seemed to be understood that the testator could not write, and it was not shown in whose handwriting the entries were made.

None of the children were present when the will was written. Testator dictated the will, knew the items of advancements made, and the sum of them. He explained to Mr. Lafon the provisions of the will and the desired disposition of the property, and, as he testified, "especially the way in which he had provided for William and Prior. Said he thought it would be best for them to have only the interest, the principal going to Henly and John for taking care of them; that if he left William and Prior the principal, it would very soon go as the balance he had given them had gone." Both the subscribing witnesses testified that his mind was perfectly clear and sound when he made his will. The two plaintiffs were each over fifty years of age and one of them married. They were both men of feeble intellect, very deaf and nearly, if not quite blind, and were not able to support themselves. Henly and John were farmers, one living within a mile of testator, and the other about three miles away.

At the conclusion of the evidence, the court was asked by defendant to give the jury the following instructions:

"1. The court instructs the jury that there is no evidence sufficient in law to prove, or tending to prove, that the execution of said will by James Maddox was

induced by the exercise of undue influence over his mind by either Henly J. Maddox or John F. Maddox.

"2. The court instructs the jury that there is no evidence before them to justify a verdict that at the time the will was executed the said James Maddox was of unsound mind, and did not have sufficient capacity to make the same."

The court in lieu of other instructions asked by the parties gave a series of fifteen instructions which were intended to cover all the issues. By these instructions he told the jury that if "the said James Maddox had sufficient strength and perception of intellect and sufficient memory to know what property he owned, and to know what property he owned and to know the number and names of his children, and to form a determination in his own mind as to what disposition he desired to make of said property, then the jury should find, that then and there the said James Maddox was of sufficiently sound mind to make said alleged will."

A portion of instruction 10 given was as follows:

"And if from all the evidence in the case the jury find that the contested will contained in its disposition gross inequality as against the contestants, with reference to their claims of natural affection, as the children of the testator, with no reason for said inequality suggested either in the alleged will, or otherwise in evidence, and that said inequality, if any, is unreasonably inconsistent with the moral duties of the alleged testator in reference to his property and family, then said inequality, if any, will require from the proponents the further proof of some reasonable explanation of such character of said alleged will, before the issue of all alleged undue influence can be found in favor of said will, unless in such event the proponents have shown by the greater weight of evidence to the reasonable

satisfaction of the jury that said will was not the product of undue influence."

I. Inquiry was made of several witnesses as to what labor the plaintiffs did on the farm of the testator years before, and they were permitted to answer against the objection of defendants. The evidence of Boon Christy will sufficiently illustrate the point. He testified: "I knew James Maddox since 1860, lived near his home, from 1860 to 1865. Prior and William Maddox lived on his (testator's) farm." "Q. What were they doing?" This question was objected to by defendants' counsel as being irrelevant and immaterial to the issues, because the time is fixed between 1860 and 1865. The objection was overruled and witness answered: "They were farm hands there on the farm and doing the work of regular farm hands." The witness was examined on no other question.

We are unable to see what this evidence had to do with the questions of testamentary capacity of the testator, or the influence of the defendants over him twenty-five years afterwards. It threw no light on the subject whatever. Plaintiffs insist that, if it was not competent, it was because it was immaterial and was, therefore, not prejudicial. It must have been thought when offered that it would have an influence on the jury or it would not have been introduced. Juries are disposed to consider the moral duties of parents to their children in the disposition of their property, and all irrelevant evidence which tends to emphasize such duties should be carefully excluded. This court held in a very recent case that the admission of evidence of the same character was improper. *Couch v. Gentry*, 113 Mo. 248.

II. A witness was asked whether, in his judgment, from his knowledge and observation of the testator, he was in November preceding his death "competent

to engage in or understand any complicated business matter or transaction." An objection to the question was urged on the ground that such competency was not a proper test of mental capacity requisite to make a will. The objection being overruled the witness answered: "If I had any complicated matter at that time I would not have been willing to entrust it to him to settle or manage for me." It is clear that the test here made of testamentary capacity goes beyond what has ever been required under the decisions of this court.

It is said in *Brinkman v. Rueggesick*, 71 Mo. 556, by NAPTON, J., that "it is conceded in most of the cases that a man may be capable of making a will, and yet incapable of making a contract or managing his estate," and in the case of *Couch v. Gentry, supra*, it is said: "If the testator understood the business about which he was engaged when he had prepared and executed his will, the persons who were the natural objects of his bounty, and the manner in which he desired the disposition to take effect, he was capable of making a will." Competency "to engage or understand any complicated business matter or transaction" requires too high a grade of capacity when compared with what is required under these decisions. Under that test a majority of men would be incapable of making a will.

III. It is next insisted that the testator was shown to have been in the possession of sufficient mental powers to enable him to make a will, and there was no evidence of the want of such capacity as would disqualify him, and on that issue the jury should have been instructed peremptorily to find the will valid. After a careful reading of the evidence we are of the opinion that defendants are right in their position, and

the second instruction asked by them should have been given.

Counsel for plaintiff, in argument, rely solely on the evidence of the two witnesses to establish want of capacity, the witness Bashore, who expressed the opinion that deceased was not capable of engaging in or understanding any complicated business matter or transaction, and of a witness named Hutchinson. As has been shown the testimony of the former did not tend to prove a want of capacity to make a will. The witness Hutchinson had been employed by deceased in the fall of 1886 to build some fencing. His evidence, so far as it bears upon the condition of the mind of the testator at that time, was as follows:

"He was to give me six cents a panel and board me; that was the arrangement with him; he settled with me as soon as I finished. I saw that he was not in as good health as in 1880, his strength of mind and memory was not as good in 1886 as in 1880. When we made our settlement he seemed to have figured it up and made it more than I did, and seemed willing to take my calculation. I don't know whether he could do all of his business in the fall of 1886 or not; I know he did some, and came to Palmyra sometimes on business, and he also bought quite a good deal of stock while I worked there that fall; I then worked there about four weeks."

On the other hand the two attesting witnesses testified to the soundness of his mind. Dr. McCabe, his family physician for thirty years, testified that in December, 1886, "his mind was good," and, up to twenty days before his death, "his mental condition then was just as I have always found it, good." Levin Hitch, an acquaintance for forty-nine years, considered him a man of sound mind. So with a number of other neighbors, merchants and bankers

with whom he associated and had transacted business, all testified to the soundness of his mind and ability to attend to all his business up to a period near his death and sometime subsequent to the date of the will. The provisions of the will, which he dictated, show his knowledge of the persons who were the natural objects of his bounty, the property he possessed, the advancements made to each of his children and the disposition he desired to make of his property. Against all this evidence of capacity we have only the two witnesses, the testimony of either or both of whom, if standing alone and uncontradicted, would not, under the foregoing tests, be sufficient to overthrow the will. It matters not that the testator was aged and infirm. Those conditions did not incapacitate him if he understood the business in which he was at the time engaged, and had a mind and memory capable of presenting to him his property and the persons who were the natural objects of his bounty, and of understanding the distribution of his property as made by the will. *Norton v. Paxton*, 110 Mo. 456.

IV. Defendants also contend that there was no evidence that justified a submission to the jury of the question of undue influence exercised by them over the mind and will of the testator, and therefore the first instruction asked should have been given. This assignment of error requires a further consideration of the evidence to ascertain if there is any evidence tending to prove that the will was the product of the wills of defendants or either of them, rather than that of the testator.

That both defendants, Henly and John, were fairly prosperous farmers, and were possessed of a healthy development of mind and body, is unquestioned; and that both contestants, Prior and William, from physical and mental defectiveness were almost

helpless, is not disputed. Neither of defendants were present when the will was written, and it was dictated in all of its details by the testator. No witness testified to an act, word or circumstance which tended to prove that the will of the testator was dominated by the influence of the defendants or either of them.

Plaintiffs, for proof of undue influence, rely upon the following facts, which were shown by the evidence: Testator could neither read nor write, but had with him a book in which advancements to his children were charged, and it was not shown who had made the entries. Prior testified that there was no substantial ground for the advancements charged against him, other than the fact that for seventeen years he had the use of a house and eighteen acres of land belonging to his father. Between 1879 and the date of the will, the testator was heard to commiserate the condition of contestants, and to declare his intention of providing well for them, and that his children should share equally in his estate. Defendants were frequent visitors at their father's house, and John lived on and had charge of the home farm for seven years at one time, he and his father dividing expenses. When that was, does not appear. John testified, that he had conversations with his father about Prior and Billy, but the purport of that conversation was not asked for by either party nor given by the witness. One witnesss heard John say that Prior ought to go to work for himself, and not come to father for corn. When this conversation took place was not shown, nor was it shown that the father was present, nor what effect the declaration had with the testator. Both of defendants were witnesses and neither offered any explanation of the will, or what if any part they or either of them took in making it or in the disposition

of the estate thereunder.    They were not questioned on the subject by counsel for either party.

The *onus* is on the proponents of a will, in a contest of this character, to prove its proper execution and attestation and also that the testator was of proper age and of sound mind.    When these facts are shown, a will *prima facie* valid is established, and it then devolves upon those attacking its validity to prove fraud or undue influence if either is charged.    *Norton v. Paxton, supra; Gay v. Gillilan,* 92 Mo. 255; Woerner's American Law of Administration, sec. 31; *Jones v. Roberts,* 37 Mo. App. 174; Schouler on Wills, sec. 239.

It is also a universally recognized rule of equity, which is applied also in analogous cases at law, that when a confidential relation is shown to exist between the testator and the recipient of his bounty an exerted influence will be presumed to have induced the bequest, and the *onus* is cast upon the beneficiaries to make explanation of the transaction and establish its reasonableness.    *Gay v. Gillilan, supra;* 2 Pomeroy's Equity Jurisprudence, sec. 951.

No such relation of confidence and trust was shown to have existed between the father and the favored sons.    They lived on and managed separate farms, and there is no word of evidence showing that the sons ever interfered in the business of the father, or were intrusted with its management or control, or were even called upon for advice.    The burden then rests upon these contestants to prove by facts or circumstances that the will was not voluntarily made by the testator, but was the product of the will of the defendants.

Undue influence, like fraud generally, can seldom be proved by direct and positive evidence.    Where, therefore, extreme age and possible susceptibility to

influence is shown in respect to the testator, and an undue portion of the estate is granted to one to the exclusion or partial exclusion of another having equal or greater demands upon his bounty, every fact and circumstance surrounding the parties at the time of the execution of the will, and which bears upon it, should be examined with the utmost scrutiny to see if it were not the product of fraud or undue influence. "Issues of * * * undue influence are generally determined upon circumstantial evidence and inferences drawn from a full presentation of facts inconclusive when taken separately." Schouler on Wills, sec. 242. But the fact that unjust discrimination was made, coupled with the other facts of old age and great debility of body are not sufficient to raise an inference that undue influence was exerted by one who received a greater portion of the estate. The tests are mental capacity and free agency. When these exist the testator has the right, as is said, "to make an unreasonable, unjust, injudicious will, and his neighbors have no right, sitting as a jury, to alter the disposition of his property, simply because they may think the testator did not do justice to his family connection." *Boylan v. Meeker,*,15 N. J. Eq. 310; *Mackall v. Mackall,* 135 U. S. 171, and cases cited; *Smith v. Smith,* 48 N. J. Eq. 591; *Jackson v. Hardin,.* 83 Mo. 185.

The helplessness of these two sons already becoming aged can but excite the sympathy and commiseration of the just, and impress one with the conviction that the natural instinct of paternity and moral and social duty called for a more liberal and independent provision.; but it was for the testator to say, from his own standpoint, where no one else could stand, knowing what he knew, and feeling what he felt, whether from caprice or mistaken judgment, what they should have and how it should be given.

It is said that the testator often expressed commiseration for the condition of these two afflicted sons, and the intention of making ample provision for them, and the provision made shows that some influence operated to change the purpose. The evidence shows that when dictating the will the testator spoke of providing for these two sons and expressed the belief that they would squander what might be left them absolutely, and thought the provision as made the most judicious. So he gave them the income on $1,000 each, during life, of which at their death $1,000 should "be equally divided between H. J. Maddox and John F. Maddox for their trouble and care of Jesse P. and W. D. Maddox." It is evident from this provision that the testator supposed that defendants, from moral duty and fraternal affection, or from some understanding with them, would take care of their two afflicted brothers during life. This was doubtless the testator's idea of making the best possible provision for them; it may have been a mistaken idea and error of judgment, but there is no evidence tending to prove that the idea and judgment were controled by the influence of defendants.

It is said that these sons made frequent visits to their father during the last years of his life, and from this circumstance we are asked to draw an inference of improper influence. We answer that in the language of another court: "It would be a great reproach to the law, in its jealous watchfulness over the freedom of testamentary dispositions, if it should deprive age and infirmity of the kindly ministrations of affection or of the power of rewarding those who bestow them." *Elliott's Will*, 2 J. J. Marsh. 340. We hope it will never be that the visits of a son to an aged and infirm parent, will be looked upon with suspicion and attributed to selfish motives.

We do not think, as declared by the instruction copied into the statement and given by the court, that the mere inequality in the disposition of the property required from proponents the further proof of some reasonable explanation thereof. Before the burden of proof can be shifted to the proponents of the will, to make an explanation of unequal or unnatural provisions there must first have been some evidence from which undue influence may have been inferred, otherwise every will which may be thought to operate unjustly would be subject to what a court or jury may regard just or judicious.

We do not think the case of *Gay v. Gillilan*, 92 Mo. 261, or the authorities cited in support of it go further. In that case the court say: "No one can read this record without being painfully impressed with the idea that George (the proponent) by his most unfilial conduct and threats had placed the mind of his aged and infirm father in complete subjection to his demands." In another part of the same decision the court declares the law in accord with the principles herein laid down, as follows: "And while it is true that the undue influence will not be presumed, yet, where such facts are proved as will authorize a jury to find the existence of undue influence, then the burden shifts, and it then devolves on the party charged to exonerate himself from such charge in like manner as in the case of fiduciary or confidential relations."

If proponents had not offered themselves as witnesses, the omission may have been ground for suspicion, but they placed themselves upon the witness stand, thereby subjecting themselves to as thorough and rigid a cross-examination as contestants desired to make. They could have been asked about the conversation with their father in reference to their two brothers;

they could have been questioned as to the part they took in entering the advancements in a book, and could have been questioned in regard to any circumstances deemed suspicious. They were not questioned at all on the vital issues in the case. Under these circumstances, we think no adverse inference can be drawn from the fact that no voluntary explanation was offered.

After a careful consideration of the evidence and drawing every legitimate inference therefrom, we are convinced that there was no evidence of the invalidity of the will, and the judgment is therefore reversed and cause remanded. All concur except BARCLAY, J., not sitting.