STATE of Missouri, Respondent,

v.

Jeffrey W. GARDNER, Appellant.

No. SC 81611.

Supreme Court of Missouri,
En Banc.

Dec. 7, 1999.

As Modified on Denial of Rehearing
Jan. 11, 2000.

Kent E. Gipson, Kansas City, for appellant.

Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

DUANE BENTON, Judge.

Defendant Jeffrey W. Gardner was convicted by a jury of second-degree murder, and sentenced to 20 years' imprisonment. After opinion by the Court of Appeals, this Court granted transfer. *Mo. Const., art. V, sec. 10.* Affirmed.

## I.

Defendant lived with Phillip Hancock and Carol Drummond, a married couple, and their daughter. On March 7, 1992, defendant shot and killed Hancock. The State presented the case to a grand jury, which returned a "no true bill." Four years later, a newly elected prosecuting attorney charged defendant with voluntary manslaughter. Because of the three-year statute of limitations on voluntary manslaughter, the State amended the complaint to second-degree murder.

In November 1991, Drummond asked Mark Lassince to shoot her husband while they were deer hunting, and make it look like an accident.

In December 1991, Hancock pushed Drummond, breaking her collar bone. Defendant witnessed the incident. Hancock pled guilty to assault, received probation, and was subject to an order of protection. In January 1992, however, Hancock moved back into the house, at Drummond's request.

Sometime in January 1992, Drummond told Phillip Gill that her husband was not going to get away with breaking her collar bone, "If we have to, we're going to blow his fucking head off, put a gun or knife in his hand where it looks like self defense where we were being threatened, and call 911."

One week before the shooting, Drummond talked with Andre Lassince about self-defense statutes and said that Hancock was being abusive. Drummond asked if he would still be her friend if she killed Hancock in self-defense.

On March, 6, 1992, Drummond told her sister, Carla Corum, that she was planning to kill her husband and asked Corum to baby-sit her daughter while she committed

the crime. Corum added that she did not believe Drummond was serious.

The next day, March 7, 1992, Drummond paged defendant, indicating she was in trouble. Defendant drove to her house, although he stopped to buy cigarettes on the way. Arriving, he found Drummond outside with her daughter and a neighbor. Drummond told defendant that Hancock was upset because someone said something about the relationship between Drummond and defendant. After discussions at the neighbor's house, Drummond and defendant decided that she would return home to talk to Hancock. According to defendant, they agreed that defendant would move out; he returned to the house to pack his clothes. (During questioning by the police, however, defendant did not say that he had decided to move out or pack his clothes.)

Defendant claimed that, once in the house, he heard Drummond ask Hancock "What are you going to do with the knife," and Hancock threaten to "field-dress" her like a deer. Defendant testified that he felt that there was a threat to Drummond's life, and that he could not just stand by and "see what happened next." Defendant went to his bedroom to get his handgun.

Defendant testified that, approaching the master bedroom, he saw Hancock standing at the foot of the bed flailing a knife around in his hand. Defendant said that Hancock's eyes were bloodshot, and he continued to yell at Drummond. Defendant claimed that as he stood in the doorway, Hancock said, "[Y]ou better stay out of this or I'm going to kill you, too." According to defendant, Hancock was 12 to 13 feet away from him. Defendant said something about calling the police, and then Hancock started moving toward him.

Defendant testified that he raised the gun, cocked it, pointed it at Hancock, and said, "This is not – not a good idea." Defendant claimed he shot one round, but could not remember it because of the adrenaline rush. According to defendant,

Hancock kept advancing and defendant fired off two or three more rounds.

Defendant continued firing until the gun jammed. Defendant insisted that he did not fire after Hancock dropped the knife. Defendant said he turned around, walked away, and did not look at Hancock anymore.

Defendant admitted, however, that he may have fired a couple of shots into Hancock as he lay on the floor. Defendant said he then checked on Drummond, telling her to call 911. He next went to the kitchen and disassembled the gun. Defendant claims he sat on the couch and cried until he felt sick and went to the bathroom. Drummond then called 911, said there was a "party armed with a knife," but did not say anyone had been shot. When police arrived, Drummond told them that her husband had gone crazy and had a knife. Again, she did not mention he had been shot.

Discovering Hancock's body, the police asked Drummond who shot him. Pointing at defendant, Drummond said, "He did." Defendant responded, "I shot him." One police officer heard defendant say, "What was I supposed to do? He had a knife." The police found a knife on the bedroom floor, wrapped in a pair of men's undershorts.

Hancock was shot three times. John Cayton, a ballistics expert, testified that the wound to Hancock's back was consistent with the bullet shoring the skin as it exited against something hard. The other exit wound was irregularly shaped, with some tearing. Cayton concluded that Hancock may have been "just up off the floor" when the two shots were fired.

Two slugs were under Hancock's body. One was underneath his back. The other was lodged between the carpet and the concrete floor, near Hancock's head.

Defendant maintained that all the shots after the first one were accidental. Cayton testified that the gun required eight pounds of pressure to trigger each shot,

more than twice the average single-action semi-automatic handgun. Defendant's gun was a 9–millimeter German Luger, World. War II vintage, with a heavier trigger to prevent accidental discharge.

On March 12, 1992, while being interviewed by the police, Drummond told Detective Lance Cull that if her husband ever attacked her with a weapon, she would have blown his head off.

## II.

■ Defendant asserts that the trial court should have sustained his motion to dismiss, due to prosecutorial vindictiveness. During informal conversations before trial, the State conceded that the statute of limitations for involuntary manslaughter had run, and requested defendant to waive the defense. Defendant refused. The State then upgraded the complaint to second-degree murder -- section 565.021.1.[1] Defendant then moved to dismiss, but was overruled. Defendant argues that the new prosecutor upgraded the charge from voluntary manslaughter to second-degree murder, in retaliation for defendant's (successful) statute of limitations defense.

■ A prosecutor has broad discretion whether to prosecute — a decision seldom subject to judicial review. *State v. Massey*, 763 S.W.2d 181, 183 (Mo.App.1988). A prosecutor does not have to file all possible charges in an initial indictment. *Massey*, at 183. A prosecutor may hold some charges in abeyance, for strategic use. *Id.*

■ The test for prosecutorial vindictiveness is whether the facts show a realistic likelihood of vindictiveness in the prosecutor's augmentation of charges. *Id.* Two factors are weighed: (1) the prosecutor's stake in deterring the exercise of some right, and (2) the prosecutor's conduct. *Id.* The burden to disprove the charge (through objective on-the-record explanations) does not shift to the prosecutor unless a realistic likelihood of vindictiveness is found. *Id.*

Defendant has not presented any evidence that the prosecutor upgraded the charge to second-degree murder in order to punish him for successfully invoking the statute of limitations. To the contrary, the prosecutor acted within his discretion, because defendant's conduct fit the statutory definition of the crime. In this case, because voluntary manslaughter was no longer an option, the State charged an offense covering his conduct. Defendant has failed to show any reasonable likelihood of prosecutorial vindictiveness.

## III.

■ Defendant claims that the trial court should have barred the State's cross-examination of Drummond, as beyond the scope of direct examination.

After subpoenaing Drummond, the State rested its case-in-chief without calling her to testify. Defendant called Drummond as his first witness:

DEFENSE COUNSEL: Tell the jury your name, please.

DRUMMOND: Carol Drummond.

DEFENSE COUNSEL: I know the man in the last row did not even hear her say her name, so you need to speak up.

DRUMMOND: Carol Drummond.

DEFENSE COUNSEL: Okay. How long have you been here today?

DRUMMOND: Hmmm, since 9:00 a.m.

DEFENSE COUNSEL: And why did you come here today?

DRUMMOND: I was subpoenaed by the prosecuting attorney.

DEFENSE COUNSEL: I have no further questions.

This testimony produced less than a page of transcript. The prosecutor then cross-examined Drummond (for 31 transcript pages) about Hancock's death, her relationships with Hancock and defendant, her

---

1. All statutory citations are to RSMo 1994.

statements to investigators, and her statements about killing her husband (which Drummond generally denied). Drummond did not directly implicate defendant. Defense counsel objected twice that the questioning exceeded the scope of direct examination. The judge overruled both objections.

There are two different rules on the scope of cross-examination. First, the English rule:

> When a witness has been sworn in chief, the opposite party may not only cross-examine him in relation to the point which he was called to prove, but he may examine him as to any matter embraced in the issue. He may establish his defence by him without calling any other witness. If he is a competent witness to the jury for any purpose, he is so for all purposes.

*Fulton Bank v. Stafford*, 2 Wend. 483, 485 (N.Y.1829).

More restrictive is the Federal rule:

> [A] party has no right to cross-examine any witness except as to facts and circumstances connected with the matters stated in his direct examination. If he wishes to examine him to other matters, he must do so by making the witness his own, and calling him as such in the subsequent progress of the cause.

*Philadelphia & Trenton R.R. Co. v. Stimpson*, 39 U.S. 448, 461, 14 Pet. 448, 10 L.Ed. 535 (1840). Most states follow the Federal rule, which is codified in the Federal Rules of Evidence. 6 *Wigmore on Evidence* Sec. 1890 (1976) (Supp.1999); *Fed.R.Evid. 611(b)*.

■ Missouri follows the Federal rule only on cross-examination of a criminal defendant (and spouse). *Section 546.260* ; *State v. Worthington*, 8 S.W.3d 83 (Mo. banc 1999). However, the Federal rule does not apply to any other witnesses. *State v. West*, 349 Mo. 221, 161 S.W.2d 966, 967 (1942).

The English rule – followed by a third of the states – thus remains the law in Missouri. 6 *Wigmore on Evidence* Sec. 1890 (1976) (Supp.1999). By the pure English rule, when a competent witness is called and sworn, the opposing party may cross-examine even if the calling party does not conduct direct examination, unless the witness was called by mistake. *Harris v. Quincy, O. & K.C. Ry. Co.*, 115 Mo.App. 527, 91 S.W. 1010, 1010 (K.C.Ct.App.1905), citing *Phillips v. Eamer*, 170 Eng. Rep. 383 (K.B.1795). Missouri modifies this rule to: If a witness is sworn and gives "some evidence," however formal or unimportant, the witness may be cross-examined as to all matters in the case. *Id.* at 1011.

Since 1840, this Court has enforced the modified English rule. *See cases cited in the appendix to this opinion.* In 1905 the legislature codified the case law. *State v. Roe*, 180 S.W. 881, 885 (Mo.1915).

> A party to a cause, civil or criminal, against whom a witness has been called and given *some evidence*, shall be entitled to cross-examine said witness (except where a defendant in a criminal case is testifying in his own behalf) on the entire case . . .

*Section 491.070*, originally enacted as *1905 Mo. Laws 307 (H.B. 166 )* (emphasis added).

■ The issue is whether Drummond's testimony was "some evidence." A witness may be examined on any issue in the case as long as the witness gives some evidence, however formal, trivial or unimportant. *St. Louis & Iron Mountain R.R. Co. v. Silver*, 56 Mo. 265, 266 (1874); *State v. Soper*, 148 Mo. 217, 49 S.W. 1007, 1010 (1899). The threshold can be merely a "single isolated fact." *Brown v. Burrus*, 8 Mo. 26, 29 (1843) (¶ 30).

In this case, Drummond stated her name, the length of time she had been at court, and that she was under subpoena by the prosecutor. Because this was "some evidence," the State was entitled to cross-examine her.

■ Defendant further argues that the trial court allowed excessive cross-examination of Drummond. Section 491.070 authorizes examination on the "entire case." This means the whole case and nothing less. *State v. Murphy*, 338 Mo. 291, 90 S.W.2d 103, 109 (1936).

■ The trial court has broad discretion over the extent of cross-examination, especially in criminal cases. *State v. Taylor*, 944 S.W.2d 925 (Mo. banc 1997); *State v. Murphy*, 338 Mo. 291, 90 S.W.2d 103, 110 (1936). Cross-examination tests a witness' accuracy, veracity and credibility. *Blake v. Keiser*, 267 S.W. 94, 97 (St.L.Ct. Mo.App.1924). Therefore, cross-examination is not necessarily limited to those matters that tend to prove the issues on trial. *State v. Mosier*, 102 S.W.2d 620, 625 (Mo.1937). True, cross-examination may not encompass incompetent, irrelevant, or immaterial matters. *State v. Mull*, 318 Mo. 647, 300 S.W. 511, 514 (1927). However, questions of relevancy are for the trial court, whose ruling will be disturbed only for abuse of discretion. *State v. Wood*, 596 S.W.2d 394, 402 (Mo. banc 1980). In this case, the circuit court did not abuse discretion in permitting the cross-examination of Drummond.

### IV.

Defendant asserts that the trial court should have excluded the rebuttal testimony of six witnesses: John Cayton, Phillip Gill, Carla Corum, Andre Lassince, Mark Lassince, and Lance Crull. In a continuing objection, defendant claimed that their testimony was irrelevant, prejudicial, and beyond the scope of rebuttal. Defendant suggests that the six witnesses were called, not to rebut his testimony, but to rebut Drummond's.

■ The trial judge determines the scope of rebuttal testimony, subject to review for abuse of discretion. *State v. Leisure*, 749 S.W.2d 366, 380 (Mo. banc 1988). "Any competent testimony that tends to explain, counteract, repel or disprove evidence offered by defendant may be offered in rebuttal of the defendant's testimony or evidence." *State v. Peterson*, 518 S.W.2d 1, 3 (Mo. banc 1974).

■ Defendant called Drummond as a witness, and the State cross-examined her. The State then called the six witnesses to rebut Drummond's testimony. Because Drummond was the defendant's witness, the State could present rebuttal evidence to her testimony. The circuit judge did not abuse discretion in permitting the rebuttal testimony.

### V.

Defendant asserts that the trial court should have permitted Drummond to testify on redirect examination that Hancock had fired defendant's gun in the bedroom, two weeks before the shooting. The offer of proof was:

THE COURT: So my understanding is your offer of proof would be before this incident happened, which caused the death of the victim, sometime before that the victim fired the gun in that room once or more than once?

DEFENSE COUNSEL: That's correct.

THE COURT: Do you agree that's what she would testify to?

PROSECUTOR: I agree that's what she would testify to, your Honor.

THE COURT: Okay. The offer of proof is denied.

According to defendant, the trial court erred because the offered testimony might counter the "incriminating inferences that could be drawn" from the two bullets found under Hancock's body.

■ On redirect examination, a witness may testify to any matter that tends to refute, weaken or remove unfavorable inferences in the testimony on cross-examination. *State v. Vitale*, 801 S.W.2d 451, 455 (Mo.App.1990), citing *State v. Lingar*, 726 S.W.2d 728, 734 (Mo.banc 1987), *cert. denied*, 484 U.S. 872, 108 S.Ct. 206, 98 L.Ed.2d 157 (1987). The trial court has

discretion to determine the extent of reha-bilitation. *Vitale,* at 455.

 Unless the record shows an abuse of discretion and a real probability of injury to the complaining party, an ap-pellate court will not interfere with the discretion of the trial court on the scope of redirect examination. *State v. Young,* 701 S.W.2d 429, 432 (Mo. banc 1985).

> Judicial discretion is abused when the trial court's ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unrea-sonable as to shock the sense of justice and indicate a lack of careful consider-ation; if reasonable persons can differ about the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion.

*Anglim v. Missouri Pacific R. Co.,* 832 S.W.2d 298, 303 (Mo. banc 1992).

 In sustaining the State's objection, the trial judge acted within his discretion. The offer of proof was vague and inconclu-sive as to the testimony itself. Defendant did not carry his burden that Drummond would testify to facts that would counter-act any unfavorable inferences.

## VI.

Defendant contends that the trial court erred in submitting instruction No. 9 on the lesser included offense of voluntary manslaughter.[2]

 The instruction should have listed the range of punishment for a Class B felony – 5 to 15 years' imprisonment. *Sec-tion 558.011.1(2).* Instead, it erroneously listed the range of punishment for a Class C felony – one day in the county jail to seven years' imprisonment. *Section 558.011.1(3); 558.011.2.* Defendant claims manifest injustice, which precluded a fair trial.

Neither party objected at trial. Review is for plain error. *Rule 30.20.* Defendant asserts a reasonable probability that the jury rejected the lesser included offense, because it was instructed on the (lesser) range of punishment of a Class C felony. He reasons that the jury would likely have convicted him of voluntary manslaughter if the sentence were 5 to 15 years.

The jury was instructed properly on the punishment for second-degree murder – 10 to 30 years. The jury chose 20 years. This option is not within the range of punishment for voluntary manslaughter – 5 to 15 years. In this case, no plain error occurred.

## VII.

Attacking another jury instruction, de-fendant notes that the verdict director for second-degree murder omitted the para-graph and definition regarding "sudden passion," and did not conform with MAI–CR 3d 313.04. Defendant argues that this eliminated any difference between the charged offense of first-degree murder, and the lesser included offense of volun-tary manslaughter.

Defendant did not object to this instruc-tion. Review is for plain error. *Rule 30.20.* Defendant advised the trial judge of the erroneous instruction – after the jury deliberated for two hours. The judge re-called the jury, read a correct instruction, and directed them to resume deliberations. Once again, defendant did not object. The jury returned the guilty verdict 82 minutes later.

 When an MAI–CR instruction is not given in accordance with the Notes on Use, it is error, with prejudice to be judicially determined. *State v. Richard-son,* 923 S.W.2d 301, 318 (Mo. banc 1996); *Rule 70.02(c).* A defendant is prejudiced by an erroneous instruction if the jury was adversely influenced. *Id.* at 319.

---

**2.** At trial, defendant did not request an in-struction on the lesser included offense of voluntary manslaughter, but did not object when the trial court submitted it on its own

motion. Defendant noted, on the record, that he did not believe that the trial court had jurisdiction to sentence him for voluntary manslaughter if the jury returned that verdict.

 Defendant asserts prejudice because he could not argue "sudden passion" in closing arguments. The judge's corrective action cured any prejudice. The jury's deliberation (for 82 minutes after receiving the proper instruction) indicates that it was not adversely influenced by the first, erroneous instruction.

## VIII.

Finally, defendant contends that the trial court should have sustained his motion for a new trial because the cumulative errors prejudiced him.

None of defendant's other six points is reversible error. No amount of non-error adds up to error; nor do the non-prejudicial errors in this case constitute reversible error. *State v. Gray*, 887 S.W.2d 369, 390 (Mo. banc 1994), *cert. denied*, 514 U.S. 1042, 115 S.Ct. 1414, 131 L.Ed.2d 299 (1995).

The judgment of the circuit court is affirmed.

All concur.

## APPENDIX

### MISSOURI CASES FOLLOWING

### THE MODIFIED ENGLISH RULE OF CROSS–EXAMINATION

*Page v. Kankey*, 6 Mo. 227, 228 [433] (1840) (¶ 433)

*Brown v. Burrus*, 8 Mo. 26, 29 (1843) (¶ 30)

*St. Louis & Iron Mountain R.R. Co. v. Silver*, 56 Mo. 265, 266 (1874)

*State v. Sayers*, 58 Mo. 585, 586 (1875)

*State v. Brady*, 87 Mo. 142, 145 (Mo.1885)

*Jones v. Roberts*, 37 Mo.App. 163, 176–77 (St.L.Ct.App.1889)

*Walter v. Hoeffner*, 51 Mo.App. 46, 50 (St. L.Ct.App.1892)

*Diel v. Stegner*, 56 Mo.App. 535, 540 (K.C.Ct.App.1894)

*State v. Soper*, 148 Mo. 217, 49 S.W. 1007, 1010 (1899)

*Ayers v. Wabash R.R.*, 190 Mo. 228, 88 S.W. 608, 609 (1905)

*Harris v. Quincy, O. & K.C. Ry. Co.*, 115 Mo.App. 527, 91 S.W. 1010, 1010 (K.C.Ct. App.1905)

*Reding v. Reding.*, 143 Mo.App. 659, 127 S.W. 936, 940 (Spr.Ct.App.1910)

*Conway v. Metropolitan St. Ry. Co.*, 161 Mo.App. 81, 142 S.W. 1101, 1102–03 (K.C.Ct.App.1912)

*State v. Roe*, 180 S.W. 881, 885 (Mo.1915)

*Blake v. Keiser*, 267 S.W. 94, 97 (St.L.Ct. App.1924)

*State v. Hersh*, 296 S.W. 433, 436 (Mo. 1927)

*State v. Murphy*, 338 Mo. 291, 90 S.W.2d 103, 107 (1936)

*Massman v. Muehlebach*, 231 Mo.App. 72, 95 S.W.2d 808, 813 (K.C.Ct.App.1936)

*State v. West*, 349 Mo. 221, 161 S.W.2d 966, 967 (1942)

*State v. Neal*, 350 Mo. 1002, 169 S.W.2d 686, 697 (1943)

*Arnold v. Manzella*, 186 S.W.2d 882, 895 (K.C.Ct.App.1945)

*State v. Parker*, 543 S.W.2d 236, 243 (Mo. App.1976)

*State v. Taylor*, 745 S.W.2d 173, 175 (Mo. App.1987)

*D.K.L. by K.L. v. H.P.M.*, 763 S.W.2d 212, 219 (Mo.App.1988)

*Loyd v. Cooper*, 899 S.W.2d 907, 908 (Mo. App.1995)