Jeffrey Wayne GARDNER, Appellant,

v.

STATE of Missouri, Respondent.

No. WD 60895.

Missouri Court of Appeals,
Western District.

Jan. 31, 2003.

Kent E. Gipson, Assistant State Public Defender, Kansas City, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Jefferson City, Philip M. Koppe, Asst. Atty. Gen., Kansas City, for Respondent.

Before JAMES M. SMART, JR., P.J., ROBERT G. ULRICH, and RONALD R. HOLLIGER, JJ.

JAMES M. SMART, JR., Judge.

A jury in Cass County convicted Jeffrey Wayne Gardner of second-degree murder in 1997. The trial court followed the jury's recommendation and sentenced Gardner to twenty years of imprisonment. The Missouri Supreme Court upheld Gardner's conviction on direct appeal. *State v. Gardner*, 8 S.W.3d 66 (Mo. banc 1999). Gardner moved for post-conviction relief under Rule 29.15, alleging constitutionally ineffective assistance of counsel. After a hearing, his motion was denied. Gardner appeals. We reverse the denial of his motion.

## Statement of Facts

In August of 1991, Gardner moved into the house of Phillip Hancock and Carol Drummond, a married couple, in Belton, Missouri. Gardner paid rent, helped with household expenses, and babysat the couple's daughter on occasion.

Hancock was sometimes abusive toward his wife. In the fall of 1991, after Hancock violently beat his wife, breaking her collarbone, Ms. Drummond obtained an order of protection against Hancock. Within a few weeks, she allowed him to return to the home. Gardner remained in the home throughout this period.

On the afternoon of March 7, 1992, Hancock was upset about Gardner's continuing presence in the household. Although exactly what happened that afternoon is disputed, it is agreed that a confrontation occurred and that Gardner shot Hancock. Hancock died of gunshot wounds, including one that penetrated his aorta and caused massive internal bleeding. Gardner fired several shots from his semi-automatic pistol, striking Hancock three times.

When the police arrived, Carol Drummond claimed to police that Hancock had been threatening her life and had threatened the life of their daughter earlier that same day. Ms. Drummond and Gardner claimed that Gardner shot Hancock in self-defense and in defense of Ms. Drummond. Both claimed that Hancock had a large hunting knife in his hand during the fight. Hancock earlier had threatened to "field dress" his wife "like a deer," Ms. Drummond said. According to Gardner and Ms. Drummond, at the time Gardner shot Hancock, Hancock was coming at Gardner and Ms. Drummond, who were near each other, with the knife. A large hunting knife was found at Hancock's feet.

The State presented the case to a grand jury. The grand jury returned a "no true bill." The State took no further action. In 1996, a new prosecutor, Chris Koster, was elected. Koster re-filed the charges against Gardner. Koster initially filed a charge of voluntary manslaughter against Gardner, but it was later brought to his attention that the three-year limitations

period for manslaughter had already expired. Koster then filed an amended complaint charging Gardner with second-degree murder, which carries no statute of limitations.

Gardner was convicted by jury of second-degree murder on July 1, 1997, and sentenced to twenty years imprisonment. This court reversed his conviction in March 1999 on direct appeal on the ground of trial court error. The Missouri Supreme Court, on transfer, disagreed, and upheld Gardner's conviction in December 1999. Gardner then filed a motion for post-conviction relief pursuant to Rule 29.15 in March 2000, claiming that his trial defense counsel, had provided him with ineffective assistance. The Circuit Court of Cass County held a hearing on the matter on June 1, 2001. Gardner's motion was denied. Gardner now appeals the denial of that motion.

### Standard of Review

Appellate review of a denial of a Rule 29.15 motion is subject to a high standard of review. Review is limited to "a determination of whether the findings and conclusions of the trial court are clearly erroneous." *Rule 29.15(k)*. "Findings and conclusions are clearly erroneous if, after a review of the entire record, the court is left with the definite and firm impression that a mistake has been made." *Moss v. State*, 10 S.W.3d 508, 511 (Mo. banc 2000).

### Standard for Grant of Post–Conviction Relief

In a Rule 29.15 motion, "the movant has the burden of proving the movant's claims for relief by a preponderance of the evidence." *Rule 29.15(i)*. Missouri follows the standard set forth by the U.S. Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), when considering motions for post-conviction relief due to ineffective assistance of counsel. *Deck v. State*, 68 S.W.3d 418, 427 (Mo. banc 2002). In order to meet this standard, movant must show by a preponderance of the evidence: "(1) that trial counsel failed to exercise the customary skill and diligence of a reasonably competent attorney under similar circumstances and (2) that counsel's deficient performance prejudiced the defense." *Deck*, 68 S.W.3d at 425; *Strickland*, 466 U.S. at 687–88, 104 S.Ct. 2052. Ineffective assistance of counsel is not so much about a particular tactical failure or two by counsel; rather, it is about a performance by counsel which falls so far short of that necessary to provide a fair trial that the court feels compelled to order a new trial. *Id.* The benchmark for determining whether counsel is ineffective is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686, 104 S.Ct. 2052.

The first prong of the *Strickland* test is difficult to meet, because there is a strong presumption that counsel provided competent assistance. *Deck*, 68 S.W.3d at 425. In order to show ineffective assistance of counsel, the movant must show "that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052. The movant is required to identify specific acts or omissions of counsel that resulted from unreasonable professional judgment, and the "court must than determine whether, in light of all the circumstances, the identified acts or omission were outside the wide range of professional competent assistance." *Id.* at 690, 104 S.Ct. 2052.

In order to meet the second prong of the *Strickland* test, the movant must show that "there is a reasonable probability that, but for counsel's unprofessional er-

rors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.*

### The Decision to Call Drummond as Witness

■ In Gardner's first point, he contends that the decision of his trial defense counsel to call Carol Drummond as a witness in the defense case resulted in extremely prejudicial evidence being presented to the jury that would have otherwise been excluded. He claims this completely reckless decision of counsel led directly to his conviction.

The prejudicial evidence described by Gardner was evidence related to the notion that Carol Drummond had intended to arrange the death of her husband. During the investigation of Hancock's death, several people informed the investigating officers that Ms. Drummond had made statements indicating an intent to kill her husband. Mark Lassince, a longtime friend of Hancock, stated that in November 1991 he went to Hancock's house to go deer hunting that day with Hancock. While he was at the house, according to Lassince, Ms. Drummond asked Lassince to shoot her husband while they were hunting and to make it look like an accident. Lassince also said that Hancock had shown him sections of his wife's diary in which she had written that Hancock would be killed. Phillip Gill, another longtime friend of Hancock, stated that in January 1992 Ms. Drummond told Gill that Hancock was not going to get away with breaking her collarbone. Gill stated that Ms. Drummond told him that: "If we have to, we're going to blow his ... head off, put a gun or knife in his hand where it looks like self defense, and then call 911." Andre Lassince, Mark Lassince's brother

and another friend of Hancock's, stated that a week before Hancock's death, Carol had mentioned the law of self-defense and asked him if he would still be her friend if she had to kill Hancock in self-defense. Ms. Drummond's own sister, Carla Corum, told police that she went into a restroom at a lounge in Belton and found Ms. Drummond there, talking with another person. Ms. Drummond said to Corum, "I'm going to kill Hancock. Will you baby-sit [my child] if I bring her by, no questions asked?" Corum said she responded, "Poo, yeah, right." Corum said this conversation took place the day before the shooting. A police detective also testified that when Carol Drummond was interviewed following the assault that broke her collarbone, she told the officer that if Hancock ever came at her with a weapon, she would kill him.

Most of these witnesses were friends of Hancock. Gardner argues that even though it might seem improbable that Carol Drummond would talk openly to her husband's friends about killing him, it was obvious to the defense that the admission at Gardner's trial of such alleged statements would potentially introduce the notion of a conspiracy between Gardner and Carol Drummond which would tend to undermine Gardner's self-defense evidence. Gardner argues that it was necessary for the defense to avoid doing anything that would trigger the admissibility of the statements. The statements were potentially explosive, because they presented the risk, if admitted in evidence, that Gardner would lose his self-defense theory and be convicted, *not* because of something *he* allegedly said or did, but because of something that Carol Drummond allegedly said. The parties regard the statements themselves as hearsay, even though expressions of intention rather than of fact. *See State v. Brown*, 833 S.W.2d 436, 440 (Mo.App.1992). Thus, it would seem that

unless the statements would qualify for admission in evidence as the statement of a co-conspirator in order to establish a conspiracy (and the prosecutor had neither pleaded nor offered to prove a conspiracy in this case),[1] the court would generally be reluctant to admit them against Gardner as substantive evidence that Carol Drummond and Jeffrey Gardner intended to kill Hancock.[2] *Id.*

As it turned out, one of these witnesses, Phillip Gill, was prepared to testify not only that Ms. Drummond made such a statement, but also that the defendant was present and within earshot when she expressed the statement. According to Gill, Ms. Drummond stated, "if *we* have to, *we* will [kill Hancock and make it look like self-defense]" (emphasis added). The fact that defendant Gardner was allegedly present when this statement was made was not clear from the police reports of the interview of Gill. Apparently, neither the prosecution nor the defense was aware before trial that the defendant allegedly overheard the statement. The prosecution did not list Gill as a witness having evidence of any admissions made by the defendant. Also, at trial, the prosecution never argued the admissibility of the statement as an admission, but only as evidence to impeach or contradict Carol Drummond's testimony that she never made such a statement.

### The Decision Viewed in Context

The defense argues that the decision of counsel to call Ms. Drummond must be viewed in the context of the evidence at trial at the time the decision was made. We agree. At trial, the State proceeded initially with the testimony of the police

officers who responded to the scene. They testified concerning the position of the body in the bedroom, found between the bed and the wall. The body was still somewhat warm to the touch, but the deceased had expired. The deceased's body had several gunshot wounds. A large hunting knife was found near the deceased's feet. The blade of the knife was obscured by part of a pair of men's underpants. It appeared that the underwear had been put around the blade, and the knife placed on the floor. A fingerprint was lifted from the knife, but it was too smudged to be of value.

A detective testified as to the statement taken from defendant Gardner in the police interview with him. Gardner said that in recent weeks "Hancock had been telling Carol to have me move out" and Gardner said he had told Carol he would as soon as he "could find a place" and "get some money." He said he told her he would be out in a month or two. Gardner stated that he arrived in the house, having earlier been summoned from work by Ms. Drummond by a signal that she and her husband were fighting and she felt at risk.

Gardner arrived at the house and waited outside. Ms. Drummond met him and they decided to go to the babysitter's house for a while. He said Ms. Drummond had told him that Hancock was mad because "somebody had said something to him about us doing something, and he wanted to talk to me about it." He said they agreed that Ms. Drummond would go over first and try to "calm him down." He then proceeded over a little later. He entered the house and could hear Hancock

---

**1.** See, e.g., State v. Fuhr, 660 S.W.2d 443, 447 (Mo.App.1983); *State v. Fogle,* 740 S.W.2d 217, 222 (Mo.App.1987). Generally, there must be evidence independent of the hearsay

statements themselves to establish the fact of a conspiracy.

**2.** *See* footnote 6 *infra.*

yelling about killing someone—either her or him—Gardner said he was not sure.

Gardner said he went to his bedroom and nervously loaded his gun. He then walked out to have his "confrontation" with Hancock. He stood in the doorway and Hancock said something about killing him. Hancock had a knife in his hand. Gardner said he "kind of felt" Hancock was coming toward him. Gardner raised the gun and put a round in the chamber, pointed it at Hancock, paused for a second, and "he was still walking toward me and that's when I started firing." Hancock fell into the TV stand, and Gardner kept firing. Gardner saw Hancock fall, and then his gun jammed. Gardner said he turned around and walked out and didn't look at him anymore. When asked if he fired after Hancock was on the floor, Gardner said, "I think I fired a couple as he was down, maybe stray. I don't think I aimed them at him. I don't know. I don't think my aim was that straight at the time." He said that after he left the bedroom, he went first to the living room and just sat there, then got up, went in the kitchen and unloaded the gun. He said Ms. Drummond called 911. He then got sick and went in the bathroom. When asked how close to him Hancock got, he said probably five to eight feet at one point. Gardner said he knew Hancock was going to kill him unless he "stopped him flat."

Prior to trial, the court sustained a motion in limine made by the defense to keep Ms. Drummond's statements to others about killing her husband from being elicited at trial.[3] The prosecution did not call Ms. Drummond during its case-in-chief, although she was under subpoena by the State and she was the only person other than Gardner to witness the shooting.

Gardner's counsel, then, after the State had rested, elected to call Ms. Drummond as an early defense witness. The examination of Carol Drummond was brief:

Counsel: Tell the jury your name, please.

Drummond: Carol Drummond.

Counsel: I know the man in the last row did not even hear her say her name, so you need to speak up.

Drummond: Carol Drummond.

Counsel: Okay. How long have you been here today?

Drummond: Hmmm, since 9:00 a.m.

Counsel: And why did you come here today?

Drummond: I was subpoenaed by the prosecuting attorney.

Counsel: I have no further questions.

The prosecution then proceeded to cross-examine Ms. Drummond. The State, in an obvious effort to help explain to the jury why Ms. Drummond was not called as a witness, asked questions designed to show that she had refused to allow herself to be interviewed by the State. The defense objected twice, claiming that the questions asked were beyond the scope of direct examination. The trial court overruled the objections.

The prosecution also then questioned Ms. Drummond about whether she had made any statements to Mark Lassince, Andre Lassince, Phillip Gill, or Carla Corum about killing her husband or whether she had written anything in her diary about killing her husband. The defense did not object to these questions. Ms. Drummond denied making the statements and writing any such statement in her diary. Gardner also testified in his own

---

**3.** The parties refer to such a motion and ruling in limine, but the legal file provides no evidence of such.

behalf, testifying that he shot Hancock in the course of defending Ms. Drummond and himself.

After the defense rested, the State, in rebuttal, called Mark Lassince, Phillip Gill, Andre Lassince, and Carla Corum. All testified about Ms. Drummond's statements, which were admitted as substantive evidence against Gardner. Gill was the first to testify. He testified concerning the alleged statement made in Gardner's presence. His testimony was followed by the others after a five-day recess in the trial, which had been requested by the defense after Gill presented his testimony as to what Ms. Drummond said in Gardner's presence. Also, following the recess, the State presented additional expert testimony. The jury, after deliberation, found Gardner guilty.

Gardner now argues that trial counsel made a monumental blunder by calling Ms. Drummond as a defense witness and exposing her to cross-examination. He asserts that trial counsel's blunder cost him an acquittal and constituted ineffective assistance of counsel. At the motion hearing, Gardner presented evidence that the decision to call Carol Drummond to the stand was inexcusable because there was nothing significant to be gained by such a move; and, under the circumstances of the case, the risk of harm was huge. Trial counsel testified that his reason for calling Carol Drummond to the stand was "to make sure that the jury was aware that Carol Drummond was available to the State as a witness." He stated:

> She had been there throughout the trial under the State's subpoena. Their failure to call an eyewitness to the case, I was concerned, could have left the jury with the belief that for some reason or another she was not available, so I merely called her to show her availability to the State.

When asked his understanding of the State's right to cross-examine her, trial counsel stated, "I was of the belief that [the State's] cross-examination would be limited to who she was and why she was here." He said he believed that the prosecution "would not be allowed to cross-examine her about any prior statements she made to others about wanting her husband dead."

In Missouri, cross-examination of witnesses is governed by RSMo. § 491.070:

> A party to a cause, civil or criminal, against whom a witness has been called and given some evidence, shall be entitled to cross-examine said witness (except where a defendant in a criminal case is testifying in his own behalf) on the entire case . . . .

This rule of evidence has been the law in Missouri courts since 1840. *Gardner*, 8 S.W.3d at 71. The rule has been codified in statutory form since 1905. *Id.* Trial counsel acknowledged he was not aware of the rule embodied in § 491.070.

The motion court found trial counsel was mistaken in his understanding of the law, but also found that his mistake did not necessarily mean that trial counsel's decision was unreasonable. The court noted that, on appeal of the conviction, the Court of Appeals also had believed the State should not have been allowed to cross-examine Carol Drummond.

This court, on the direct appeal in this case, held that because Carol Drummond simply stated her name, the time she arrived at the courthouse, and that she had been subpoenaed by the prosecution, she had not given relevant evidence that would trigger the statutory right of the opposing party to unfettered cross-examination. The Missouri Supreme Court, however, later held that Ms. Drummond had in fact given "some evidence" within the meaning

of § 491.070. The court thus held that the full cross-examination was proper. *Gardner*, 8 S.W.3d at 71–72.

A court deciding an ineffectiveness claim must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052. The decision to put Carol Drummond on the stand must be viewed in light of all the applicable factors, as they would have been viewed at that time, including whether there was anything significant to be gained by putting her on, even if everything went extremely well. Moreover, the motion court's decision assumes that trial counsel was aware of the statute, as though he made a strategic decision based on his understanding of the statute after researching the applicable law. That is not the case here. Trial counsel was unaware of the law and had failed to research the issue, although trial counsel knew that the State was not planning to present Ms. Drummond's testimony.[4]

The State had the burden of proof to overcome Gardner's evidence of self-defense and defense of others. Defense counsel could not properly make an "adverse inference" argument because Carol Drummond was equally available to both parties. *State v. Moore*, 620 S.W.2d 370, 374 (Mo. banc 1981). Counsel could, however, even without calling Carol Drummond, have properly emphasized the State's burden of proof, arguing to the jury that the evidence of self-defense presented by Gardner had not been overcome by the State.

The State, in arguing trial counsel's decision was not unreasonable, prefers to focus strictly on whether the error of law

was, as an abstract proposition, understandable. The State points out that many attorneys and judges are not aware of the rule codified at § 491.070 and tend to assume a rule similar to the Federal rule (which restricts the cross-examination to the scope of the direct) is followed in Missouri. Therefore, the State argues, trial counsel was not unreasonable in his ignorance. The State's argument, however, fails to place the decision in its context. At the time of this decision, the State had already rested its case. Trial counsel acknowledged at the motion hearing that both parties viewed Carol Drummond as an extremely unreliable witness. Also, as we have discussed, Ms. Drummond allegedly had made statements that could be potentially damaging to Gardner's theory of defense. To put her on the stand would create a risk that she could be asked about her alleged statements. Because of the large risk created by putting Carol Drummond on the stand, with little to be gained, one would think that competent counsel would be careful, in implementing the decision, to research the law and have a citation of authority handy, to make sure the State could not get into a substantial cross-examination which could include asking her about her alleged statements. Trial counsel failed to do that. Trial counsel, in fact, testified that some news reporters who were following the case "talked him into" putting Carol Drummond on the stand.

Further, it is clear from the record that counsel's ignorance of the potential of wide-open cross-examination was not the sole ineffective act of counsel with regard to the cross-examination. Trial counsel's objections (beyond the scope of direct)

---

4. In his opening statement, defense counsel told the jury that he anticipated that the State would not call Ms. Drummond to testify.

were made only to questions asked by the prosecution which were arguably *not* beyond the scope of the direct. The prosecution began its cross-examination by addressing the fact that it did not call her to testify. The State attempted to show that Ms. Drummond had refused to cooperate with the State and had declined to be interviewed. Trial counsel, in calling her, had attempted to raise an inference to the jury that the State was hiding some information by not calling Ms. Drummond to the stand. The State, in dealing with that inference, logically should have been entitled to present evidence in cross-examination that Ms. Drummond had refused to be interviewed by the State. Such evidence could be viewed as responsive to the notion that the State was trying to hide something from the jury. Thus, quite arguably, the questions about the witness's lack of cooperation were *not* outside the scope of the direct examination.[5] Accordingly, it would be within trial court discretion to deny the objections.

When the State then began to ask Ms Drummond about her alleged statements *to other persons* (which was more clearly outside the "scope" of the direct), the defense *failed* to object on the ground that the cross-examination was exceeding the scope of the direct. At that point, the defense, in fact, failed to object at all on any basis.

We agree that a reasonable attorney would not have risked the possibility of the introduction of Carol Drummond's alleged out-of-court statements solely in order to provide the jury with an inference which had little to do with the merits and which, in any case, could not properly be emphasized in closing argument. Moreover, the maneuver of putting Ms. Drummond on

the stand, then not asking any substantive questions, may well have left the jury somewhat confused. Finally, the failure to object at all to the introduction of the alleged statements of Ms. Drummond (or even to seek a limiting instruction as to the use of such statements) was not effective lawyering. In light of the entire circumstances, the decision to put Carol Drummond on the stand at all (without being better prepared to contain the cross-examination) looks completely unreasonable. We conclude that the motion court's ruling that trial counsel's decision was not unreasonable was "clearly erroneous."

### Failure to Take Mistrial

■ Before addressing the issue of prejudice with regard to the first claim of ineffectiveness, we turn to the second claim of ineffectiveness so that the two may be considered together. Gardner also claims that counsel was ineffective in declining the opportunity for a mistrial after the State surprised the defense with Phillip Gill's testimony. Gardner argues that a reasonable attorney would have accepted the court's offer for a mistrial and that there is a reasonable likelihood that the outcome of a second trial would have been different.

Gill was the first witness called by the State to rebut the testimony of Carol Drummond. When Gill testified concerning Ms. Drummond's statement in the presence of Gardner, the defense, caught by surprise, immediately moved for a mistrial. While the statement itself had been disclosed to the defense ˏbefore trial, the fact that Gardner had been present when the statement was made had not been disclosed. The defense immediately realized, and so did the court, that the fact

---

**5.** Thus, the State could suggest that, rather than the State trying to hide something, it was Ms. Drummond (and perhaps Gardner too)

trying to hide something. The fact all of this had very limited relevance does not mean the court should have *sua sponte* prevented it.

that Gardner was allegedly present during the remark, and allegedly made no attempt to distance himself from the remark, was damaging. The trial court agreed to grant a mistrial because of the non-disclosure by the State.

After discussing the situation with Gardner, trial counsel requested a recess for five days instead of a mistrial. Trial counsel testified at the motion hearing that the court had said that, in a second trial, Gill's statement would probably be admissible against Gardner as an adoptive admission. Trial counsel said, "What I didn't realize and didn't think to myself was that the other witnesses' testimony was not going to come in at the second trial." Thus, in a second trial, arguably it would have been only Gill's statement to deal with, rather than the cumulative effect of all of them. Because trial counsel did not think of that fact, he did not encourage the taking of a mistrial. Instead, he asked for a short continuance in order to try to discover material with which to impeach Gill. The court granted the continuance. Trial counsel acknowledged at the motion hearing that he accomplished nothing during that recess. The State, however, utilized the recess to develop rebuttal testimony by the firearms expert which was designed to strengthen the theory that Gardner had fired some shots at Hancock after he was already on the floor. After the recess, Gill and the other "rebuttal" witnesses testified as to Ms. Drummond's statements. Trial counsel, at this point, failed to oppose the admissibility of the other statements. Gardner now argues that trial counsel was ineffective since he did not insist on a mistrial. If a mistrial had been granted, Gardner argues, trial counsel could have subsequently tried the case without calling Drummond to the stand, and the "rebuttal" witnesses (other than Gill, who could have been called in behalf of the State) would not have been called in a later trial.

At the time of the decision of whether to take the mistrial, both Gardner and trial counsel believed the trial was going well and that a mistrial would result in a waste of time. When the court was discussing whether a mistrial would be appropriate, Gardner stated: "What I'm concerned is, you know, just the fact of having to start all over again; you know, the wasting time of his time, their time, my time, your time [ ] and the jury's time, so on and so forth, to start all over again with the process."

It is true that the case had gone relatively well for the defense through the State's case-in-chief. Gill's testimony began, however, to raise in the jury's mind the possibility, whether true or not, of a scheme to kill Hancock hatched by Carol Drummond and Gardner. Because of the fact that Carol Drummond was cross-examined about alleged statements made to other persons (Mark and Andre Lassince and Carla Corum), it should have been obvious to the defense that the prosecution may very well have been prepared to offer all of them as rebuttal witnesses. Unless the defense had a plan for how to exclude the testimony of those witnesses, or to impeach them, their testimony concerning Ms. Drummond's statements would negatively impact the jury's perception of the defense. Allowing the jury to hear, over and over, that Carol Drummond was trying to kill her husband would not be helpful to the defense. Add to that the fact that the defense, rather than distancing Gardner from Carol Drummond, had summoned her to the stand as though she were allied with the defense.

██ Trial counsel admitted in his motion court testimony that he had no plan as to how to exclude the evidence of these witnesses at that point because he did not even think about the fact that the State would present them. Counsel had a duty

to consider the risk and to warn his client accordingly. The standard rule is that if a client participates in a decision, he is bound by that decision, and cannot claim ineffective assistance of counsel. *State v. Ervin*, 835 S.W.2d 905, 930 (Mo. banc 1992), *cert. denied* 507 U.S. 954, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993). However, even when the defendant participates in the decision, the defendant is entitled to reasonably competent advice in making the decision. *Id.* Although we would not say that counsel's lack of astute advice was by itself necessarily ineffective assistance of counsel, we believe this ill-advised decision by the defense was consistent with a deficient performance by counsel overall.

### Prejudice

We next consider the second prong of the *Strickland* test: "that counsel's deficient performance prejudiced the defense." *Deck*, 68 S.W.3d at 425. To show prejudice, Gardner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. Gardner demonstrated prejudice to the satisfaction of the motion court judge, who had also been the trial court judge. The motion court found that "[i]n Movant's trial, the record is clear that Carol Drummond's testimony on cross-examination was damaging to Movant's defense, therefore Movant may have met his burden to show prejudice . . . ." The court also said, in oral remarks, that the cross-examination of Carol Drummond was "extremely prejudicial, and it may well have been the linchpin that resulted in [Gardner's] conviction. I believe that to be true."

We agree with the motion court that there is a reasonable probability that the result of the proceeding would have been different if trial counsel had not made the strategic error of calling Drummond to the stand. The State's case-in-chief consisted of evidence that Gardner shot Hancock, including Gardner's statement, the violent nature of the relationship between Hancock and his wife, and ballistics evidence as to the three bullets which struck the deceased. The State was relying in part on evidence that Hancock may have been shot *after* he had fallen to floor, to show that Hancock was not killed in self-defense as Gardner claimed. The introduction of the evidence that Carol Drummond had made statements concerning planning her husband's death, Gardner argues, transformed a self-defense case, or at the worst a voluntary manslaughter case, into a conspiracy-to-commit-murder case.

The State responds to the prejudice argument by saying that Gardner was not prejudiced, because the State could have called Carol Drummond as a rebuttal witness to Gardner's testimony after he testified, and that the State could then have called the rebuttal witnesses to then rebut her testimony. The problem with this argument is that Carol Drummond's testimony would not have qualified as rebuttal testimony because she would not have contradicted the testimony of Gardner in any substantive way (and in any event, the State did not know what she would say, so it could not demonstrate her testimony was rebuttal). Also, evidence about her statements was not proper rebuttal because the defense had made no assertions about what Carol Drummond said or did not say. Thus, the statements, even if they occurred, would not contradict any evidence put on by the defense. In order to have called her as a rebuttal witness, the State would have been required to demonstrate that her testimony, if believed, would have cast doubt on Gardner's testimony. We know of no authority for the proposition that the State is allowed to call a witness during rebuttal only for the

purpose of subsequently impeaching that witness. The State also provides no such authority.

The State does not argue that, in any event, the State could have called the witnesses in its case-in-chief as statements of a co-conspirator. Nor, as we have already noted, *supra,* does it appear that these statements would have been admissible on that basis, even if the State had properly given notice of its intent to do so. There must be evidence independent of the hearsay statements themselves to establish the fact of a conspiracy. *State v. Fogle,* 740 S.W.2d 217, 222 (Mo.App.1987). Here, the State makes no argument that it had such evidence to establish a conspiracy.[6]

Of course, the State could have cross-examined Gardner about whether he ever was present at a time when Carol Drummond was talking about killing her husband. If he admitted he was present when any such statements were made, the State would have elicited something potentially useful to the prosecution—evidence at least that he was aware that Carol Drummond wanted Hancock killed, and evidence suggesting the likelihood that she and Gardner had talked about it. The State, however, would not have been able to present any "rebuttal" testimony from other people as to such statements (because such evidence would not rebut anything Gardner said). If Gardner denied that he ever heard such a remark, the State we now know, could have presented Gill's testimony as rebuttal. It is not at all clear, however, that the State could have presented the testimony of others as to other statements. Apparently neither the State nor the defense knew prior to trial that

Gardner was present when Carol Drummond made the statement to Gill. The police report did not indicate that Gill was saying that Gardner heard the remark, and the State never listed Gill as a witness to any admission made by Gardner. The State also never argued anything of admissibility other than that the statements were rebuttal to the testimony of Ms. Drummond.

Because the prosecution was just as surprised by Gill's testimony as the defense, the prosecution did not realize that it could have cross-examined Gardner about the statement (or possibly offered it in the State's case-in-chief). In any event, the State never asked Gardner whether he heard Ms. Drummond make such a statement. Thus, in view of all the circumstances we believe that it was only the unreasonable strategy of counsel that led to the admission of the statements. Accordingly, we agree with the motion court that the decision to call Ms. Drummond as a witness was pivotal.

In asking ourselves whether counsel's performance, in the decision to have Ms. Drummond testify and in other matters of alleged ineffectiveness, was such that the ineffective actions of counsel are such as to undermine our confidence that justice was done in the proceeding, we must consider the overall circumstances. We are able to grant relief "only if the entire record reveals that defendant was prejudiced." *State v. Graham,* 906 S.W.2d 771, 786 (Mo. App.1995). The evidence was less than certain as to what actually happened the day of the shooting. There was evidence from which a jury may have been able to conclude Gardner was guilty of voluntary

---

6. The State also does not argue that the alleged statements would not be subject to a hearsay objection because the alleged declarant, Carol Drummond, was present and available to be called by either party. She could be examined and cross-examined concerning her alleged remarks, which relieves the primary concern of the hearsay rule. The State argues their admissibility only for purposes of impeachment and rebuttal.

manslaughter.[7] But there was less evidence, apart from the alleged statements of Carol Drummond, that Gardner was guilty of murder.[8]

We conclude that the unreasonable decision to place Ms. Drummond on the stand was the pivotal point in this prosecution. We also note that viewing the quality of counsel's performance from an overall standpoint, *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052, there were other aspects of counsel's performance which were deficient, even if not constitutionally deficient. This was not a case of an overall sound and effective performance by counsel, with the record clouded only by a single tactical error.

## Overall Performance

Gardner points out, for instance, that counsel failed to object to two defects in the verdict directing jury instructions. The verdict directing instruction for murder in the second degree did not contain the paragraph on sudden passion as required by MAI–Cr. 313.04. The instruction for voluntary manslaughter contained the wrong range of punishment. While these failures by counsel were not likely material to the result, *see State v. Gardner,* 8 S.W.3d 66 (Mo. banc 1999), they adversely reflect on the overall performance of counsel.

Gardner also contends that his trial counsel was ineffective in failing to adequately cross-examine the State's expert witness, John Cayton. Cayton worked as a firearms expert at the Regional Crime Lab in Kansas City. After the defense case, Cayton, who testified earlier, was recalled as a rebuttal witness. He testified that Gardner's trial version of the shooting was inaccurate. Gardner had testified during trial that he had fired shots at Hancock while Hancock was still advancing toward Gardner in a threatening manner. Cayton testified that two of the bullet exit wounds found on Hancock did not support this scenario. One of the exit wounds was "shored," which means the wound had a clear cookie cutter type exit wound with bruising around it. The shoring occurred, according to Cayton, when the bullet smashed the surrounding skin as it exited against something hard. The "shoring" of the exit wound indicated that Hancock was against a hard object, such as the floor, when the bullet exited. A second exit wound did not exhibit complete "shoring," according to Cayton, but the wound was consistent with Hancock being only a minimal distance away from a hard object. Cayton's testimony suggested that Hancock was lying in a prone position on the floor when he received two of his gunshot wounds.

Cayton had given testimony in an earlier murder trial, and that the testimony given

---

7. The ballistics evidence, showing that two of the shots were probably fired at Hancock either while he was falling or after he had hit the floor, together with Gardner's admission to police that "I think I fired a couple as he was down, maybe stray," presumably would have been sufficient to uphold a conviction for voluntary manslaughter.

8. There was testimony as to the unusual position at the scene of the knife (which had no fingerprints of value). The knife appeared as though someone may have used a pair of underwear to hold the knife and place it on

the floor. The prosecution also presented evidence that Richard Hancock contacted the police that day to discuss whether he could have Gardner removed from the home. According to the officer with whom Hancock spoke, Hancock was not raving or irrational. Carol Drummond called 911 a short time later and screamed something about a knife (we were not provided a copy of the transcript introduced at trial) but apparently she did not say that Hancock had been shot, even though the call was made after the shooting.

in that case was later proved to be incorrect. See *Trotter v. State*, 736 S.W.2d 536, 538 (Mo.App.1987). Trial counsel acknowledged at the motion hearing that he did not bring out this fact on cross-examination because he did not want to embarrass Mr. Cayton. While it is doubtful that this failure was material, it again reflects somewhat unfavorably on the overall performance of counsel.

Counsel also failed to make an adequate offer of proof concerning testimony he wished to present. Although the offer of proof could easily have been made by a question-and-answer method which would have been specific, trial counsel made a very vague narrative offer, which the Missouri Supreme Court found to be too vague to preserve the matter for appeal. *Gardner*, 8 S.W.3d at 72–73. Again, this reflects unfavorably on counsel's overall performance.

### Summary and Conclusion

This court's review is limited to "a determination of whether the findings and conclusions of the trial court are clearly erroneous." *Rule 29.15(k)*. "Findings and conclusions are clearly erroneous if, after a review of the entire record, the court is left with the definite and firm impression that a mistake has been made." *Moss v. State*, 10 S.W.3d 508, 511 (Mo. banc 2000). We do not say that counsel's performance was miserable in all particulars or that counsel showed no flashes of skill in the defense of the matter. Counsel was an experienced defense attorney and showed an ability to think on his feet in the examination of witnesses. It was also clear, however, that counsel had not interviewed any of the key witnesses and had not prepared beyond reviewing the police reports. Even so, because the State's murder case was relatively weak, if it were not for the strategic blunders which began with the entirely unreasonable decision to call Ms. Drummond to the stand, there is a substantial probability that Gardner would have been acquitted of murder.

In view of all of the foregoing, we conclude: "(1) that trial counsel failed to exercise the customary skill and diligence of a reasonably competent attorney under similar circumstances and (2) that counsel's deficient performance prejudiced the defense." *Deck*, 68 S.W.3d at 425; *Strickland*, 466 U.S. at 687–88, 104 S.Ct. 2052. We also conclude that counsel's errors and overall performance in the conduct of the defense were such that we cannot be confident in the trial having achieved a just result. The motion court's findings were clearly erroneous.

We reverse the judgment of the motion court. We determine that counsel was constitutionally ineffective and that such ineffectiveness deprived defendant of a fair trial. The case is remanded to the trial court for a new trial.

ULRICH and HOLLIGER, JJ., concur.